# CALIFORNIA DEPARTMENT OF CORRECTIONS ET AL. *v.* MORALES

No. 93–1462.   Argued January 9, 1995—Decided April 25, 1995

THOMAS, J., delivered the opinion of the Court, in which REHNQUIST, C. J., and O'CONNOR, SCALIA, KENNEDY, GINSBURG, and BREYER, JJ., joined. STEVENS, J., filed a dissenting opinion, in which SOUTER, J., joined, *post*, p. 514.

*James Ching,* Supervising Deputy Attorney General of California, argued the cause for petitioner. With him on the briefs were *Daniel E. Lungren,* Attorney General, *George Williamson,* Chief Assistant Attorney General, *Kenneth C. Young,* Senior Assistant Attorney General, *Joan W. Cavanagh,* Supervising Deputy Attorney General, and *G. Lewis Chartrand, Jr.*

*James R. Asperger* argued the cause for respondent. With him on the brief were *Daniel H. Bookin, Brian D. Boyle,* and *Thomas J. Karr.*\*

JUSTICE THOMAS delivered the opinion of the Court.

In 1981, the State of California amended its parole procedures to allow the Board of Prison Terms to decrease the frequency of parole suitability hearings under certain circumstances. This case presents the question whether the application of this amendment to prisoners who committed

*Briefs of *amici curiae* urging reversal were filed for the State of Georgia by *Michael J. Bowers,* Attorney General, *Terry L. Long,* Assistant Attorney General, and *Daryl A. Robinson,* Senior Assistant Attorney General; for the State of Pennsylvania et al. by *Ernest D. Preate, Jr.,* Attorney General of Pennsylvania, and *Andrea F. McKenna,* Senior Deputy Attorney General, *Grant Woods,* Attorney General of Arizona, *Gale A. Norton,* Attorney General of Colorado, *John M. Bailey,* Chief State's Attorney of Connecticut, *Elizabeth Barrett-Anderson,* Attorney General of Guam, *Robert A. Marks,* Attorney General of Hawaii, *Larry EchoHawk,* Attorney General of Idaho, *Roland W. Burris,* Attorney General of Illinois, *Pamela Fanning Carter,* Attorney General of Indiana, *Robert T. Stephan,* Attorney General of Kansas, *Jeremiah W. (Jay) Nixon,* Attorney General of Missouri, *J. Joseph Curran, Jr.,* Attorney General of Maryland, *Scott Harshbarger,* Attorney General of Massachusetts, *Hubert H. Humphrey III,* Attorney General of Minnesota, *Joseph P. Mazurek,* Attorney General of Montana, *Don Stenberg,* Attorney General of Nebraska, *Frankie Sue Del Papa,* Attorney General of Nevada, *Deborah T. Poritz,* Attorney General of New Jersey, *Heidi Heitkamp,* Attorney General of North Dakota, *Lee Fisher,* Attorney General of Ohio, *Susan B. Loving,* Attorney General of Oklahoma, *T. Travis Medlock,* Attorney General of South Carolina, *Jan Graham,* Attorney General of Utah, *Rosalie Simmonds Ballentine,* Attorney General of the Virgin Islands, *Joseph B. Meyer,* Attorney General of Wyoming, and *Eleni M. Constantine;* for the Criminal Justice Legal Foundation et al. by *Kent S. Scheidegger, Charles L. Hobson,* and *Kevin Washburn;* and for the Pacific Legal Foundation et al. by *Ronald A. Zumbrun* and *Anthony T. Caso.*

*Ronald D. Maines, Robert Burke,* and *Jonathan Smith* filed a brief for the National Legal Aid and Defender Association et al. as *amici curiae* urging affirmance.

their crimes before it was enacted violates the *Ex Post Facto* Clause. We conclude that it does not.

## I

California twice has convicted respondent Jose Ramon Morales of murder. In 1971, the body of respondent's girlfriend, Gina Wallace, was found in an abandoned medical building. She had been shot in the head, neck, and abdomen; her right thumb had been amputated and her face slashed repeatedly. A bloody fingerprint near the body matched respondent's. A jury found respondent guilty of first-degree murder, and he was sentenced to life in prison.

While serving his sentence at the State Training Facility in Soledad, California, respondent met Lois Washabaugh, a 75-year-old woman who had begun visiting inmates after gaining an interest in prison reform. Ms. Washabaugh visited respondent on numerous occasions, and respondent kept in contact with her through correspondence. Respondent's letters eventually expressed a romantic interest in Ms. Washabaugh, and the two were married some time after respondent's release to a halfway house in April 1980.

On July 4, 1980, Ms. Washabaugh left her home and told friends that she was moving to Los Angeles to live with her new husband. Three days later, police officers found a human hand on the Hollywood Freeway in Los Angeles. Ms. Washabaugh was reported missing at the end of July, and fingerprint identification revealed that the hand was hers. Her body was never recovered. Respondent was subsequently arrested and found in possession of Ms. Washabaugh's car, purse, credit cards, and diamond rings.

Respondent pleaded *nolo contendere* to the second-degree murder of Ms. Washabaugh. He was sentenced to a term of 15 years to life, but became eligible for parole beginning in 1990. As required by California law, see Cal. Penal Code Ann. § 3041 (West 1982), the Board of Prison Terms (Board) held a hearing on July 25, 1989, to determine respondent's

suitability for parole. California law required the Board to set a release date for respondent unless it found that "the public safety requires a more lengthy period of incarceration for this individual." § 3041(b). The Board found respondent unsuitable for parole for numerous reasons, including the heinous, atrocious, and cruel nature of his offense; the mutilation of Ms. Washabaugh during or after the murder; respondent's record of violence and assaultive behavior; and respondent's commission of his second murder while on parole for his first. Supplemental App. to Pet. for Cert. 45.

Under the law in place at the time respondent murdered Ms. Washabaugh, respondent would have been entitled to subsequent suitability hearings on an annual basis. 1977 Cal. Stats., ch. 165, § 46. In 1981, however, the California Legislature had authorized the Board to defer subsequent suitability hearings for up to three years if the prisoner has been convicted of "more than one offense which involves the taking of a life" and if the Board "finds that it is not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for the finding." Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982).[1] In light of the considerations that led it to find respondent unsuitable for parole, and based on its conclusion that a longer period of observation was required before a parole release date could be projected, the Board determined that it was not reasonable to expect that respondent would be found suitable for parole in 1990 or 1991. Pursuant to the 1981 amendment, the Board scheduled the next hearing for 1992.

---

[1] The statute was again amended in 1990 to allow the Board the alternative of deferring hearings for five years if the prisoner has been convicted of more than two murders, Cal. Penal Code Ann. § 3041.5(b)(2)(C) (West Supp. 1994), 1990 Cal. Stats., ch. 1053, and in 1994 to extend that alternative to prisoners convicted of even a single murder, 1994 Cal. Stats., ch. 560. The 5-year deferral applies, however, "only to offenses committed before July 1, 1977, or on or after January 1, 1991," 1990 Cal. Stats., ch. 1053, and thus appears to have no application to respondent, whose most recent crime was committed in 1980.

Respondent then filed a federal habeas corpus petition in the United States District Court for the Central District of California, asserting that he was being held in custody in violation of the Federal Constitution. See 28 U. S. C. § 2254. Respondent argued that as applied to him, the 1981 amendment constituted an *ex post facto* law barred by Article I, § 10, of the United States Constitution. The District Court denied respondent's habeas petition, but the United States Court of Appeals for the Ninth Circuit reversed. 16 F. 3d 1001 (1994).[2] Because "a prisoner cannot be paroled without first having a parole hearing," the Court of Appeals concluded that "any retrospective law making parole hearings less accessible would effectively increase the [prisoner's] sentence and violate the ex post facto clause." *Id.*, at 1004. The Court of Appeals accordingly held that the Board was constitutionally constrained to provide respondent with annual parole suitability hearings, as required by the law in effect when he committed his crime. *Id.*, at 1006.

We granted certiorari, 512 U. S. 1287 (1994), and we now reverse.

## II

Article I, § 10, of the Constitution prohibits the States from passing any "ex post facto Law." In *Collins* v. *Youngblood*, 497 U. S. 37, 41 (1990), we reaffirmed that the *Ex Post Facto* Clause incorporated "a term of art with an established meaning at the time of the framing of the Constitution." In accordance with this original understanding, we have held that the Clause is aimed at laws that "retroactively alter the definition of crimes or increase the punishment for criminal acts." *Id.*, at 43 (citing *Calder* v. *Bull*, 3 Dall. 386, 391–392

---

[2] During the pendency of this action, respondent appeared before the Board for his 1992 suitability hearing. The Board again found respondent unsuitable and again determined that it was not reasonable to expect that he would be found suitable for parole at the following two annual hearings. Respondent's next suitability hearing was then set for 1995.

(1798) (opinion of Chase, J.); *Beazell* v. *Ohio*, 269 U. S. 167, 169–170 (1925)).

The legislation at issue here effects no change in the definition of respondent's crime. Instead, the question before us is whether the 1981 amendment to § 3041.5 increases the "punishment" attached to respondent's crime. In arguing that it does, respondent relies chiefly on a trilogy of cases holding that a legislature may not stiffen the "standard of punishment" applicable to crimes that have already been committed. See *Lindsey* v. *Washington*, 301 U. S. 397, 401 (1937); *Miller* v. *Florida*, 482 U. S. 423 (1987); *Weaver* v. *Graham*, 450 U. S. 24 (1981).

In *Lindsey*, we established the proposition that the Constitution "forbids the application of any new punitive measure to a crime already consummated." 301 U. S., at 401. The petitioners in *Lindsey* had been convicted of grand larceny, and the sentencing provision in effect at the time they committed their crimes provided for a maximum sentence of "not more than fifteen years." *Id.*, at 398. The applicable law called for sentencing judges to impose an indeterminate sentence up to whatever maximum they selected, so long as it did not exceed 15 years. *Id.*, at 398, 400. Before the petitioners were sentenced, however, a new statute was passed that *required* the judge to sentence the petitioners to the 15-year maximum; under the new statute, the petitioners could secure an earlier release only through the grace of the parole board. *Id.*, at 398–399. We held that the application of this statute to petitioners violated the *Ex Post Facto* Clause because "the measure of punishment prescribed by the later statute is more severe than that of the earlier." *Id.*, at 401.

*Weaver* and *Miller* held that the *Ex Post Facto* Clause forbids the States to enhance the measure of punishment by altering the substantive "formula" used to calculate the applicable sentencing range. In *Weaver*, the petitioner had been sentenced to 15 years in prison for his crime of

second-degree murder. Both at the time of his crime and at the time his sentence was imposed, state statutes provided a formula for mandatory reductions to the terms of all prisoners who complied with certain prison regulations and state laws. The statute that the petitioner challenged and that we invalidated retroactively reduced the amount of "gain time" credits available to prisoners under this formula. Though the statute preserved the possibility that some prisoners might win back these credits if they convinced prison officials to exercise their discretion to find that they were especially deserving, see 450 U. S., at 34, n. 18, we found that it effectively eliminated the lower end of the possible range of prison terms. *Id.*, at 26–27, 31–33. The statute at issue in *Miller* contained a similar defect. The Florida sentencing scheme had established "presumptive sentencing ranges" for various offenses, which sentencing judges were required to follow in the absence of "clear and convincing reasons" for a departure. At the time that the petitioner in *Miller* committed his crime, his presumptive sentencing range would have been 3½ to 4½ years. Before his sentencing, however, the state legislature altered the formula for establishing the presumptive sentencing range for certain sexual offenses by increasing the "primary offense points" assigned to those crimes. As a result, petitioner's presumptive range jumped to 5½ to 7 years. We held that the resulting increase in the "quantum of punishment" violated the *Ex Post Facto* Clause. 482 U. S., at 433–434.[3]

---

[3] Our opinions in *Lindsey, Weaver,* and *Miller* suggested that enhancements to the measure of criminal punishment fall within the *ex post facto* prohibition because they operate to the "disadvantage" of covered offenders. See *Lindsey,* 301 U. S., at 401; *Weaver,* 450 U. S., at 29; *Miller,* 482 U. S., at 433. But that language was unnecessary to the results in those cases and is inconsistent with the framework developed in *Collins* v. *Youngblood,* 497 U. S. 37, 41 (1990). After *Collins,* the focus of the *ex post facto* inquiry is not on whether a legislative change produces some ambiguous sort of "disadvantage," nor, as the dissent seems to suggest, on whether an amendment affects a prisoner's *"opportunity* to take advan-

Respondent insists that the California amendment before us is indistinguishable from the legislation at issue in *Lindsey, Weaver,* and *Miller,* and he contends that those cases control this one. We disagree. Both before and after the 1981 amendment, California punished the offense of second-degree murder with an indeterminate sentence of "confinement in the state prison for a term of 15 years to life." Cal. Penal Code Ann. § 190 (West 1982). The amendment also left unchanged the substantive formula for securing any reductions to this sentencing range. Thus, although 15 years was the formal "minimum" term of confinement, see *ibid.,* respondent was able to secure a one-third "credit" or reduction in this minimum by complying with prison rules and regulations, see § 2931. The amendment had no effect on the standards for fixing a prisoner's initial date of "eligibility" for parole, see *In re Jackson,* 39 Cal. 3d 464, 476, 703 P. 2d 100, 108 (1985), or for determining his "suitability" for parole and setting his release date, see Cal. Penal Code Ann. §§ 3041, 3041.5 (West 1982).

The 1981 amendment made only one change: It introduced the possibility that after the initial parole hearing, the Board would not have to hold another hearing the very next year, or the year after that, if it found no reasonable probability that respondent would be deemed suitable for parole in the interim period. § 3041.5(b)(2). In contrast to the laws at issue in *Lindsey, Weaver,* and *Miller* (which had the purpose and effect of enhancing the range of available prison terms, see *Miller, supra,* at 433–434), the evident focus of the California amendment was merely " 'to relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings' " for prisoners who have no reasonable chance of being released. *In re Jackson, supra,* at 473, 703 P. 2d, at 106 (quoting legislative history). Rather than

tage of provisions for early release," see *post,* at 518, but on whether any such change alters the definition of criminal conduct or increases the penalty by which a crime is punishable.

changing the sentencing range applicable to covered crimes, the 1981 amendment simply "alters the method to be followed" in fixing a parole release date under identical substantive standards. See *Miller, supra,* at 433 (contrasting adjustment to presumptive sentencing range with change in "the method to be followed in determining the appropriate sentence"); see also *Dobbert* v. *Florida,* 432 U. S. 282, 293–294 (1977) (contrasting change in the "quantum of punishment" with statute that merely "altered the methods employed in determining whether the death penalty was to be imposed").

## III

Respondent nonetheless urges us to hold that the *Ex Post Facto* Clause forbids any legislative change that has any conceivable risk of affecting a prisoner's punishment. In his view, there is "no principled way to determine how significant a risk of enhanced confinement is to be tolerated." Brief for Respondent 39. Our cases have never accepted this expansive view of the *Ex Post Facto* Clause, and we will not endorse it here.

Respondent's approach would require that we invalidate any of a number of minor (and perhaps inevitable) mechanical changes that might produce some remote risk of impact on a prisoner's expected term of confinement. Under respondent's approach, the judiciary would be charged under the *Ex Post Facto* Clause with the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures, including such innocuous adjustments as changes to the membership of the Board of Prison Terms, restrictions on the hours that prisoners may use the prison law library, reductions in the duration of the parole hearing, restrictions on the time allotted for a convicted defendant's right of allocution before a sentencing judge, and page limitations on a defendant's objections to presentence reports or on documents seeking a pardon from the governor. These and countless other changes might create some speculative,

attenuated risk of affecting a prisoner's actual term of confinement by making it more difficult for him to make a persuasive case for early release, but that fact alone cannot end the matter for *ex post facto* purposes.[4]

Indeed, contrary to the approach advocated by respondent, we have long held that the question of what legislative adjustments "will be held to be of sufficient moment to transgress the constitutional prohibition" *must* be a matter of "degree." *Beazell,* 269 U. S., at 171. In evaluating the constitutionality of the 1981 amendment, we must determine whether it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes.[5] We have previously declined to articulate a single "formula" for identifying those legislative changes that have a sufficient effect on substantive crimes or punishments to fall within the constitutional prohibition, see *ibid.,* and we have no occasion to do so here. The amendment creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes, and such conjectural effects are insufficient under any threshold we might establish under the *Ex Post Facto* Clause. See *Dobbert, supra,* at 294 (refusing to accept "speculation" that the effective punishment under a new

---

[4] The dissent proposes a line between those measures that deprive prisoners of a parole hearing and those that "make it more difficult for prisoners to obtain release." *Post,* at 524. But this arbitrary line has absolutely no basis in the Constitution. If a delay in parole hearings raises *ex post facto* concerns, it is because that delay effectively increases a prisoner's term of confinement, and not because the hearing itself has independent constitutional significance. Other adjustments to mechanisms surrounding the sentencing process should be evaluated under the same standard.

[5] Contrary to the dissent's suggestion, see *post,* at 519, we express no view as to the constitutionality of any of a number of other statutes that might alter the timing of parole hearings under circumstances different from those present here.

statutory scheme would be "more onerous" than under the old one).[6]

First, the amendment applies only to a class of prisoners for whom the likelihood of release on parole is quite remote. The amendment enabled the Board to extend the time between suitability hearings only for those prisoners who have been convicted of "more than one offense which involves the taking of a life." Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982).[7] The California Supreme Court has noted that about

---

[6] The dissent suggests that any "speculation" as to the effect of the amendment on prison terms should "ru[n] in the other direction," *post*, at 525, but this approach effectively shifts to the State the burden of persuasion as to respondent's *ex post facto* claim. Not surprisingly, the dissent identifies no support for its attempt to undo the settled rule that a claimant must bear the risk of nonpersuasion as to the existence of an alleged constitutional violation. Although we have held that a party asserting an *ex post facto* claim need not carry the burden of showing that he would have been sentenced to a lesser term under the measure or range of punishments in place under the previous statutory scheme, see *Lindsey* v. *Washington*, 301 U. S., at 401, we have never suggested that the challenging party may escape the ultimate burden of establishing that the measure of punishment itself has changed. Indeed, elimination of that burden would eviscerate the view of the *Ex Post Facto* Clause that we reaffirmed in *Collins*. Just as "[t]he inhibition upon the passage of *ex post facto* laws does not give a criminal a right to be tried, in all respects, by the law in force when the crime charged was committed," *Gibson* v. *Mississippi*, 162 U. S. 565, 590 (1896), neither does it require that the sentence be carried out under the identical legal regime that previously prevailed.

[7] The dissent mischaracterizes our analysis in suggesting that we somehow have concocted a "reduced" standard of judicial scrutiny for application to "a narrow group as unpopular . . . as multiple murderers." *Post*, at 522. The *ex post facto* standard we apply today is constant: It looks to whether a given legislative change has the prohibited effect of altering the definition of crimes or increasing punishments. Our application of that standard necessarily considers a number of factors—including, in this case, that the 1981 amendment targets a group of prisoners whom the California Legislature deemed less likely than others to secure early release on parole—but the constitutional standard is neither "enhanced" nor

90% of *all* prisoners are found unsuitable for parole at the initial hearing, while 85% are found unsuitable at the second and subsequent hearings. *In re Jackson,* 39 Cal. 3d, at 473, 703 P. 2d, at 105. In light of these numbers, the amendment "was seen as a means 'to relieve the [Board] from the costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released.'" *Ibid.* (quoting legislative history).

Second, the Board's authority under the amendment is carefully tailored to that end. The amendment has no effect on the date of any prisoner's initial parole suitability hearing; it affects the timing only of *subsequent* hearings. Accordingly, the amendment has no effect on any prisoner unless the Board has first concluded, after a hearing, not only that the prisoner is unsuitable for parole, but also that "it is not reasonable to expect that parole would be granted at a hearing during the following years." Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982). "This is no arbitrary decision," *Morris* v. *Castro,* 166 Cal. App. 3d 33, 38, 212 Cal. Rptr. 299, 302 (1985); the Board must conduct "a full hearing and review" of all relevant facts, *ibid.,* and state the bases for its finding. Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982). Though California law is not entirely clear on this point, the reliability of the Board's determination may also be enhanced by the possibility of an administrative appeal. See 15 Cal. Admin. Code § 2050 (1994).

Moreover, the Board retains the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner. The default requirement is an annual hearing, but the Board may defer the next hearing up to two years more depending on the circumstances. Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982). Thus, a mass murderer who has participated in re-

---

"reduced" on the basis of societal animosity toward multiple murderers. Cf. *ibid.*

peated violent crimes both in prison and while on parole could perhaps expect a 3-year delay between suitability hearings, while a prisoner who poses a lesser threat to the "public safety," see § 3041(b), might receive only a 2-year delay. In light of the particularized findings required under the amendment and the broad discretion given to the Board, the narrow class of prisoners covered by the amendment cannot reasonably expect that their prospects for early release on parole would be enhanced by the opportunity of annual hearings. For these prisoners, the amendment simply allows the Board to avoid the futility of going through the motions of reannouncing its denial of parole suitability on a yearly basis.

Respondent suggests that there is some chance that the amendment might nevertheless produce an increased term of confinement for some prisoners who might experience a change of circumstances that could render them suitable for parole during the period between their hearings. Brief for Respondent 39. Respondent fails, however, to provide any support for his speculation that the multiple murderers and other prisoners subject to the amendment might experience an unanticipated change that is sufficiently monumental to alter their suitability for release on parole. Even if we assume the possibility of such a change, moreover, there is no reason to conclude that the amendment will have any effect on any prisoner's actual term of confinement, for the current record provides no basis for concluding that a prisoner who experiences a drastic change of circumstances would be precluded from seeking an expedited hearing from the Board. Indeed, the California Supreme Court has suggested that under the circumstances hypothesized by respondent "the Board could advance the suitability hearing," *In re Jackson*, *supra*, at 475, 703 P. 2d, at 107, and the California Department of Corrections indicates in its brief that the Board's "practice" is to "review for merit any communication from an inmate asking for an earlier suitability hearing," Reply

Brief for Petitioner 3, n. 1. If the Board's decision to postpone the hearing is subject to administrative appeal, the controlling regulations also seem to preserve the possibility of a belated appeal. See 15 Cal. Admin. Code § 2050 (1994) (time limits for administrative appeals "are directory only and may be extended"). An expedited hearing by the Board—either on its own volition or pursuant to an order entered on an administrative appeal—would remove any possibility of harm even under the hypothetical circumstances suggested by respondent.

Even if a prisoner were denied an expedited hearing, there is no reason to think that such postponement would extend any prisoner's actual period of confinement. According to the California Supreme Court, the possibility of immediate release after a finding of suitability for parole is largely "theoretica[l]," *In re Jackson*, 39 Cal. 3d, at 474, 703 P. 2d, at 106; in many cases, the prisoner's parole release date comes at least several years after a finding of suitability. To the extent that these cases are representative, it follows that "the 'practical effect' of a hearing postponement is not significant." *Id.*, at 474, 703 P. 2d, at 106–107. This is because the Board is bound by statute to consider "any sentencing information relevant to the setting of parole release dates" with an eye toward establishing "uniform terms for offenses of similar gravity and magnitude in respect to their threat to the public." Cal. Penal Code Ann. § 3041(a) (West 1982). Under these standards, the fact that a prisoner had been "suitable" for parole prior to the date of the hearing certainly would be "relevant" to the Board's decision in setting an actual release date, and the Board retains the discretion to expedite the release date of such a prisoner. Thus, a prisoner who could show that he was "suitable" for parole two years prior to such a finding by the Board might well be entitled to secure a release date that reflects that fact. Such a prisoner's ultimate date of release would be entirely unaffected by the change in the timing of suitability hearings.

## IV

Given these circumstances, we conclude that the California legislation at issue creates only the most speculative and attenuated risk of increasing the measure of punishment attached to the covered crimes. The Ninth Circuit's judgment that the amendment violates the *Ex Post Facto* Clause is accordingly reversed.

*It is so ordered.*

JUSTICE STEVENS, with whom JUSTICE SOUTER joins, dissenting.

In 1980, respondent was charged with the murder of his wife. Despite respondent's previous conviction for first-degree murder, and despite the serious character of the 1980 offense, California accepted his plea of *nolo contendere* to the offense of second-degree murder. The trial judge imposed a sentence of imprisonment for 15 years to life, under which respondent became eligible for parole in 1990.

The law in effect at the time of respondent's offense entitled him to a hearing before the Board of Prison Terms (Board) in 1989 and in each year thereafter. In 1981, however, California amended its parole statute. The amended statute permitted the Board to delay parole hearings for multiple murderers for up to three years, provided the Board found that "it is not reasonable to expect that parole would be granted at a hearing during the following years." Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982). In 1989, the Board determined that respondent was not yet "suitable" for parole, and, after making the requisite findings, the Board deferred respondent's next hearing for three years. The question before the Court is whether the California Legislature's 1981 elimination of the statutory right to an annual parole hearing increased the punishment for respondent's 1980 offense and thereby violated the *Ex Post Facto* Clause.

In answering that question, I begin with certain propositions of law that I do not understand the Court to dispute.

Those propositions compel the conclusion that, as applied to the general prison population, replacing a statutory right to an annual parole hearing with a right to such a hearing every three years would violate the *Ex Post Facto* Clause of the Federal Constitution. Though nowhere disputing this conclusion, the majority holds that the 1981 amendment to the California parole statute is not *ex post facto* legislation because it applies only to a small subset of the prison population, namely multiple murderers, see *ante*, at 510, and because the Board must make a special finding before depriving a prisoner of an annual hearing, see *ante*, at 511. In my view, neither of these features is sufficient to save what is otherwise a plainly invalid statute.

I

The Constitution provides that "[n]o State shall . . . pass any . . . ex post facto Law." Art. I, § 10. The Framers viewed the prohibition on *ex post facto* legislation as one of the fundamental protections against arbitrary and oppressive government.[1] Thus, for example, Madison noted that "*ex post facto* laws . . . are contrary to the first principles of the social compact and to every principle of sound legislation." The Federalist No. 44, p. 282 (C. Rossiter ed. 1961). Similarly, Hamilton counted the prohibition on *ex post facto* laws among the three protections that he described as "greater securities to liberty and republicanism than any [the Constitution] contains." *Id.*, No. 84, at 511.

Although the text of the *Ex Post Facto* Clause is not self-explanatory, its basic coverage has been well understood at least since 1798, when the Court in *Calder* v. *Bull*, 3 Dall.

---

[1] That the Framers included two separate clauses in the Constitution prohibiting *ex post facto* legislation, see Art. I, § 9, cl. 3 ("No Bill of Attainder or ex post facto Law shall be passed"); Art. I, § 10 ("No State shall . . . pass any Bill of Attainder, ex post facto Law, or Law impairing the Obligation of Contracts"), highlights the Framers' appraisal of the importance of that prohibition.

386, 390, identified four categories of *ex post facto* laws.[2] The case before us today implicates the third *Calder* category, which consists of "[e]very law that *changes the punishment*, and inflicts a *greater punishment*, than the law annexed to the crime, when committed." *Ibid.* (emphasis in original). This Court has consistently condemned laws falling in that category. Thus, in *Beazell* v. *Ohio*, 269 U. S. 167 (1925), Justice Stone noted that it "is settled, by decisions of this Court so well known that their citation may be dispensed with, that any statute . . . which makes more burdensome the punishment for a crime, after its commission, . . . is prohibited as *ex post facto.*" *Id.*, at 169–170. We reaffirmed Justice Stone's observation only a few years ago: "The *Beazell* formulation is faithful to our best knowledge of the original understanding of the *Ex Post Facto* Clause: Legislatures may not retroactively . . . increase the punishment for criminal acts." *Collins* v. *Youngblood,* 497 U. S. 37, 43 (1990).

In light of the importance that the Framers placed on the *Ex Post Facto* Clause, we have always enforced the prohibition against the retroactive enhancement scrupulously. Any statute that authorizes an increased term of imprisonment for a past offense is invalid. Thus, although the Court has carefully examined laws changing the conditions of confinement to determine whether they are favorable or unfavorable to the prisoner, see, *e. g., Rooney* v. *North Dakota,* 196 U. S. 319, 325 (1905); *In re Medley,* 134 U. S. 160, 171 (1890), no Member of the Court has ever voted to uphold a statute

---

[2] "1st. Every law that makes an action done before the passing of the law, and which was *innocent* when done, criminal; and punishes such action. 2d. Every law that *aggravates* a *crime,* or makes it *greater* than it was, when committed. 3d. Every law that *changes the punishment,* and inflicts a *greater punishment,* than the law annexed to the crime, when committed. 4th. Every law that alters the *legal* rules of *evidence,* and receives less, or different, testimony, than the law required at the time of the commission of the offence, *in order to convict the offender.*" *Calder* v. *Bull,* 3 Dall. 386, 390 (1798) (emphasis in original).

that retroactively increased the length of time that a prisoner must remain imprisoned for past offenses, see, *e. g.,* *Miller* v. *Florida,* 482 U. S. 423 (1987) (unanimous opinion); *Weaver* v. *Graham,* 450 U. S. 24 (1981) (without dissent).

Our *ex post facto* jurisprudence concerning increased punishment has established three important propositions. First, the Court has squarely held that an individual prisoner need not prove that the retroactive application of a law authorizing an increased punishment for a past offense has actually affected the sentence that that prisoner must serve. In *Lindsey* v. *Washington,* 301 U. S. 397 (1937), for example, petitioners were sentenced under a law that required a sentence of 15 years; the law in effect at the time of the offense gave the judge discretion to impose a lesser sentence. The State contended that petitioners had failed to show that there was an *ex post facto* violation because petitioners might have received a 15-year sentence even under the old law. We unanimously rejected the State's contention:

> "[T]he *ex post facto* clause looks to the standard of punishment prescribed by a statute, rather than to the sentence actually imposed. . . .
>
> "Removal of the possibility of a sentence of less than fifteen years, at the end of which petitioners would be freed from further confinement and the tutelage of a parole revocable at will, operates to their detriment in the sense that the standard of punishment adopted by the new statute is more onerous than that of the old." *Id.,* at 401.

Only a few years ago, in *Miller* v. *Florida,* 482 U. S. 423 (1987), we unanimously reaffirmed the holding in *Lindsey,* noting that *"Lindsey* establishes 'that one is not barred from challenging a change in the penal code on *ex post facto* grounds simply because the sentence he received under the new law was not more onerous than that which he might have received under the old.'" 482 U. S., at 432 (citation

omitted). As we stated succinctly in *Weaver* v. *Graham*, 450 U. S., at 33, "[t]he inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual."

Second, we have noted that an impermissible increase in the punishment for a crime may result not only from statutes that govern initial sentencing but also from statutes that govern parole or early release. Thus, in *Weaver* v. *Graham*, we addressed a Florida statute that altered the availability of good-time credits. We rejected any notion that the removal of good-time credits did not constitute an increase in punishment, explaining that "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed." *Id.*, at 32, citing *Wolff* v. *McDonnell*, 418 U. S. 539, 557 (1974); *Warden* v. *Marrero*, 417 U. S. 653, 658 (1974). See also *Greenfield* v. *Scafati*, 277 F. Supp. 644, 645 (Mass. 1967) (three-judge court) ("The availability of good conduct deductions is considered an essential element of the sentence"), summarily aff'd, 390 U. S. 713 (1968).

Finally, we have held that an increase in punishment occurs when the State deprives a person of the *opportunity* to take advantage of provisions for early release. Thus, in *Weaver* we emphasized that "petitioner is . . . disadvantaged by the reduced opportunity to shorten his time in prison simply through good conduct." 450 U. S., at 33–34. Our statement in *Weaver* was consistent with our holding in *Lindsey* that "[i]t is plainly to the substantial disadvantage of petitioners to be deprived of all opportunity to receive a sentence which would give them freedom from custody and control prior to the expiration of the 15-year term." 301 U. S., at 401–402. See also *Greenfield* v. *Scafati*, 277 F. Supp. 644 (Mass. 1967) (three-judge court), summarily aff'd, 390 U. S. 713 (1968) (affirming judgment of a three-judge court that

found an *ex post facto* violation in a statute that eliminated the opportunity to accumulate gain time for the first six months following parole revocation as applied to an inmate whose crime occurred before the statute's enactment).

These settled propositions make perfectly clear that the retroactive application of a simple statute that changed the frequency of a statutorily mandated annual parole suitability hearing would constrict an inmate's opportunity to earn early release and would thus constitute increased punishment in violation of the *Ex Post Facto* Clause. It is thus no surprise that nearly every Federal Court of Appeals and State Supreme Court to consider the issue has so held. See, *e. g.*, 16 F. 3d 1001 (CA9 1994) (case below); *Roller* v. *Cavanaugh*, 984 F. 2d 120 (CA4), cert. dism'd, 510 U. S. 42 (1993); *Akins* v. *Snow*, 922 F. 2d 1558 (CA11), cert. denied, 501 U. S. 1260 (1991); *Rodriguez* v. *United States Parole Commission*, 594 F. 2d 170 (CA7 1979); *State* v. *Reynolds*, 642 A. 2d 1368 (N. H. 1994); *Griffin* v. *State*, 315 S. C. 285, 433 S. E. 2d 862 (1993), cert. denied, 510 U. S. 1093 (1994); *Tiller* v. *Klincar*, 138 Ill. 2d 1, 561 N. E. 2d 576 (1990), cert. denied, 498 U. S. 1031 (1991).[3]

The 1981 amendment at issue in this case, of course, is not such a simple statute. It is therefore necessary to consider whether the particular features of that amendment eliminate the *ex post facto* problems.

---

[3] The two contrary decisions cited by the parties, see *Bailey* v. *Gardebring*, 940 F. 2d 1150 (CA8 1991); *In re Jackson*, 39 Cal. 3d 464, 703 P. 2d 100 (1985), do not undermine my thesis. In *Bailey* v. *Gardebring*, a 2-to-1 decision, the Court of Appeals found no *ex post facto* violation when Minnesota failed to provide a prisoner with an annual parole hearing. However, one member of the majority premised his conclusion on the view that the Minnesota parole regulations were not "laws"; the other member of the majority concurred only in the result, but authored no opinion. In *In re Jackson*, the California Supreme Court upheld the very amendment at issue in this case and thus did not speak to the more general situation I have described in the text.

## II

The first special feature that the majority identifies in the 1981 amendment, see *ante*, at 510, is that it applies only to the narrow class of prisoners who have "been convicted, in the same or different proceedings, of more than one offense which involves the taking of a life." Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982). In my view, the 1981 amendment's narrow focus on that discrete class of prisoners implicates one of the principal concerns that underlies the constitutional prohibition against retrospective legislation—the danger that the legislature will usurp the judicial power and will legislate so as to administer justice unfairly against particular individuals. This concern has been at the forefront of our *ex post facto* jurisprudence. As Justice Harlan noted: "[T]he policy of the prohibition against *ex post facto* legislation would seem to rest on the apprehension that the legislature, in imposing penalties on past conduct, . . . may be acting with a purpose not to prevent dangerous conduct generally but to impose by legislation a penalty against specific persons or classes of persons." *James* v. *United States*, 366 U. S. 213, 247, n. 3 (1961) (Harlan, J., concurring in part and dissenting in part). Our cases have thus consistently noted that the *Ex Post Facto* Clauses protect against the danger of such "vindictive legislation." *Miller* v. *Florida*, 482 U. S., at 429; *Weaver* v. *Graham*, 450 U. S., at 29; see also *Malloy* v. *South Carolina*, 237 U. S. 180, 183 (1915). The narrower the class burdened by retroactive legislation, the greater the danger that the legislation has the characteristics of a bill of attainder.[4] Cf. *Plaut* v. *Spendthrift Farm, Inc., ante*, at 241

---

[4] "A bill of attainder is a legislative act which inflicts punishment without a judicial trial. . . . [L]egislative acts, no matter what their form, that apply either to named individuals or to easily ascertainable members of a group in such a way as to inflict punishment on them without a judicial trial are bills of attainder prohibited by the Constitution." *United States* v. *Lovett*, 328 U. S. 303, 315–316 (1946) (internal quotation marks omitted). The prohibitions on *ex post facto* laws and on bills of attainder

(BREYER, J., concurring in judgment) (finding a separation-of-powers violation in part because of the statute's "application to a limited number of individuals"); see generally *ante*, at 241–242 (discussing the dangers of statutes focused at particular groups of individuals).

I believe that the 1981 amendment implicates this core *ex post facto* concern. The narrow class of affected individuals belies the majority's acceptance of the proposition that "the evident focus," *ante*, at 507, of the 1981 amendment was to save costs. Surely, even today, multiple murderers make up but a small fraction of total parole hearings; eliminating those hearings would seem unlikely to create substantial savings. Indeed, though the majority gives credence to the budget-cutting rationale, petitioners are much more frank about their motivations, as they urge the Court to "reexamine" its *ex post facto* jurisprudence "[i]n view of the national trend towards the implementation of harsher penalties and conditions of confinement for offenders and inmates." Brief for Petitioners 11 (footnote omitted).

I agree with petitioners' implication that the 1981 amendment is better viewed as part of that national trend toward "get-tough-on-crime" legislation. The California statute challenged in this case is one of many currently popular statutes designed to cut back on the availability of parole. The California Legislature has adopted several similar provisions in recent years,[5] and a number of other States have passed comparable legislation.[6] Such measures are, of course, entirely legitimate when they operate prospectively, but their

---

are obviously closely related. See, *e. g.*, *Fletcher* v. *Peck*, 6 Cranch 87, 138–139 (1810).

[5] The California Legislature appears to have altered the frequency of parole hearings for some prisoners on at least three occasions since the 1981 amendment. See 1986 Cal. Stats., ch. 248, § 166; 1990 Cal. Stats., ch. 1053, § 1; 1994 Cal. Stats., ch. 560, § 1.

[6] See, *e. g.*, 1992 N. H. Laws, ch. 254:13; Mich. Comp. Laws Ann. § 791.234 (West 1992); Ill. Rev. Stat., ch. 38, ¶ 1003–3–5(f) (1987); S. C. Code Ann. § 24–21–645 (Supp. 1987).

importance and prevalence surely justify careful review when those measures change the consequences of past conduct.

The danger of legislative overreaching against which the *Ex Post Facto* Clause protects is particularly acute when the target of the legislation is a narrow group as unpopular (to put it mildly) as multiple murderers. There is obviously little legislative hay to be made in cultivating the multiple murderer vote. For a statute such as the 1981 amendment, therefore, the concerns that animate the *Ex Post Facto* Clause demand enhanced, and not (as the majority seems to believe) reduced, judicial scrutiny.[7]

## III

The second feature of the 1981 amendment on which the majority relies is the provision requiring that the Board make certain findings before it may defer the annual hearings. At the time of respondent's crime, the Board was instructed either to set a parole date at an inmate's initial parole hearing or, if it set no date, to provide the inmate with a written statement explaining the reasons for the denial and suggesting "activities in which he might participate that will benefit him while he is incarcerated." The statute provided that the Board "shall hear each case annually thereafter." Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982).

The 1981 amendment allows the Board to defer the annual hearings for multiple murderers for up to three years if "the [B]oard finds that it is not reasonable to expect that parole

---

[7] Though the Court suggests that "multiple murderers" have a particularly low likelihood of parole, *ante*, at 510–511, n. 7, the statute in effect at the time of respondent's offense determined that even multiple murderers were sufficiently likely candidates for early release to be entitled to an annual parole hearing. The grant of that statutory right reflected the California Legislature's judgment that such a hearing provided an important avenue to reduced punishment. The *Ex Post Facto* Clause, properly construed, should prevent the legislature from revising that judgment retroactively.

would be granted at a hearing during the following years and states the bases for the finding." *Ibid.* The statute does not contain any provision authorizing any sort of review of a Board order dispensing with annual hearings. Nor does it provide any procedure for dealing with exceptional changed circumstances warranting the setting of a release date that might arise before the next scheduled hearing. In short, the amended statute vests unreviewable discretion in the Board to dispense with annual hearings for up to three years by making the required finding.

In my view, the requirement that the Board make this finding is insufficient to render the 1981 amendment constitutional. We have previously expressed doubts that an early release regime that substitutes administrative discretion for statutory requirements complies with the *Ex Post Facto* Clause. In *Weaver* v. *Graham*, we noted that the state statute at issue reduced the amount of gain time to which an inmate was "automatically entitled . . . simply for avoiding disciplinary infractions and performing his assigned tasks." 450 U. S., at 35. The State argued, however, that the statute as a whole caused inmates no increase in punishment because the statute provided inmates with new ways to earn gain time. We rejected the State's argument, noting that "the award of the extra gain time is purely discretionary, contingent on both the wishes of the correctional authorities and special behavior by the inmate." *Ibid.*

The reasoning behind our skepticism in *Weaver* is applicable to this case. As is true under almost any factfinding regime, the Board will occasionally make mistakes and will defer parole hearings for inmates who would have been found suitable at those hearings.[8] Because the parole hear-

---

[8] There may be reasons to be particularly skeptical of the reliability of the Board's findings with respect to deferrals under the 1981 amendment. The Board's determination that the inmate is not currently suitable for parole and the determination that the inmate will not be suitable for parole in the next three years are expected to be separate determina-

ing is a prerequisite for early release, the inmates affected by the Board's errors will have had their punishment increased. In my view, the Court's speculation about possible methods of correcting the Board's erroneous findings or of persuading the Board to reinstate a canceled hearing on the basis of new evidence is plainly insufficient to bridge the significant gap between the protection afforded by an unqualified right to annual hearings and the unreviewable discretion of an administrative agency to dispense with such hearings.[9]

## IV

Two final elements of the majority's opinion require comment. First, the majority suggests that a holding in respondent's favor would require that we "invalidate" an "endless array of legislative adjustments," thus plunging the judiciary into micromanagement of state parole procedures. *Ante*, at 508. The majority's fear is completely unfounded. The provision of a parole hearing in California differs from all of the matters set forth by the majority in one critical way: It is an absolute prerequisite to release. For the three years in which respondent is denied his hearing, he is absolutely deprived of any parole opportunity. Though the changes to which the majority refers might well make it more difficult for prisoners to obtain release, none of them deprives prisoners of the opportunity for release. Our cases

---

tions. In the state-court litigation over the constitutionality of this statute, the State argued that compliance with the requirement of separate determinations was "'virtually impossible'" because "'[b]oth the decision to deny parole and to delay a subsequent hearing for two years must be the same.'" *In re Jackson*, 39 Cal. 3d, at 478, 703 P. 2d, at 109. Indeed, in respondent's case, the findings on parole suitability and on the possibility of future parole are remarkably similar. The Board's findings on which the majority relies so heavily thus seem of particularly questionable utility.

[9] I find it somewhat ironic that the majority posits the existence of nonstatutory, extraordinary remedies as a cure for legislation ostensibly motivated entirely by an interest in administrative efficiency.

are absolutely clear that the retroactive deprivation of the opportunity for early release constitutes *ex post facto* legislation. The majority's parade of hypothetical horribles is easily distinguishable from the case before us, and it thus provides no justification for diverging from our settled approach.

Second, the majority attempts to circumvent our *ex post facto* cases by characterizing the risk that the statute will actually increase any inmate's punishment as "speculative." In my view, the speculation runs in the other direction. Under the present California parole procedures, there is no possibility that an inmate will benefit from the 1981 amendment: Instead of an unqualified statutory right to an annual hearing, the amendment leaves the inmate with no protection against either the risk of a mistaken prediction or the risk that the Board may be influenced by its interest in curtailing its own workload. Moreover, the statute gives an inmate no right to advance favorable changed circumstances as a basis for a different result. Unlike the *ex post facto* law condemned in *Weaver*, and also unlike the statutes approved in *Dobbert* v. *Florida*, 432 U. S. 282 (1977), and *Rooney* v. *North Dakota*, 196 U. S. 319 (1905), the 1981 amendment contains no off-setting benefits for the inmate. By postponing and reducing the number of parole hearings, ostensibly for the sole purpose of cutting administrative costs, the amendment will at best leave an inmate in the same position he was in, and will almost inevitably delay the grant of parole in some cases.

The Court concludes, nevertheless, that it is "speculative" to say that the statute will increase inmates' punishment. To draw such a conclusion, the Court "speculates" about the accuracy of the Board's predictions, it "speculates" about the parole suitability of a class of prisoners, it "speculates" about the length of time that elapses between an eventual parole hearing and the ultimate release date, and it "speculates" as to the availability of procedures to deal with unexpected

changes in circumstances. To engage in such pure speculation while condemning respondent's assertion of increased punishment as "speculative" seems to me not only unpersuasive, but actually perverse.

I respectfully dissent.