## IN THE SUPREME COURT OF MISSISSIPPI
### NO. 95-CA-00856-SCT

*STEVE PUCKETT, COMMISSIONER OF THE MISSISSIPPI DEPARTMENT OF CORRECTIONS*

*v.*

*LARRY ABELS, DEVIASSI LATEFF ADAMS, EUGENE ADAMS, FREDDIE ADAMS, JR., ROY LEE ADAMS, WILLIE ADDISON, TIMOTHY AKBAR, CHARLES LYDEL ALDRIDGE, JIMMY FRANK ALLEN, PATRICK ALLEN, VERGIL MAURESE ALLEN, CHARLES ALLISON, SHERMAN ONEIL AMOS, JUDY ANDERSON, LEVONZEL ANDERSON, MELONEY L. ANDERSON, MICHAEL DESM ANDERSON, VICTOR ANDREWS, VICTOR B. ANDREWS, NATIVIDAD ARREOLA, MICHAEL ANTHONY AUTIN, NICKY JOE BABB, RICHARD ARN BAGGETT, ALBERT JAMES BAILEY, ET AL.*

| | |
|---|---|
| DATE OF JUDGMENT: | 07/18/95 |
| TRIAL JUDGE: | HON. JAMES E. GRAVES JR. |
| COURT FROM WHICH APPEALED: | HINDS COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | OFFICE OF THE ATTORNEY GENERAL |
| | BY: JOSEPH S. GOFF |
| | JAMES M. NORRIS |
| ATTORNEY FOR APPELLEES: | THOMAS FORTNER |
| NATURE OF THE CASE: | CIVIL - OTHER |
| DISPOSITION: | AFFIRMED - 11/21/96 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | 12/12/96 |

**EN BANC.**

**SULLIVAN, PRESIDING JUSTICE, FOR THE COURT:**

¶1. On June 15, 1995, Appellees filed a complaint in the Circuit Court of the First Judicial District of Hinds County, Mississippi for a declaratory judgment. This complaint asked for a declaratory judgment as to the applicability of Senate Bill 2175, Section 4, paragraph 4, amending Miss. Code Ann. § 47-5-138 (1993) (Earned Release), as unconstitutional to crimes that occurred prior to the effective date of this bill. The retroactive application of this bill requires that eighty-five percent (85%) of a sentence be served and eliminates the opportunity for parole that existed prior to Senate

Bill 2175. The Appellees were all charged with felony crimes that occurred prior to July 1, 1995, the effective date of Senate Bill 2175, and their charges were not to be disposed of until after July 1, 1995. On June 19, 1995, Appellees filed an amended complaint for declaratory judgment, citing Senate Bill 2175, Section 3, paragraph (1)(g), amending Miss. Code Ann. §47-7-3 (Supp. 1993), as also being violative of the United States and Mississippi Constitutions. On June 21, 1995, Steve Puckett, Commissioner of the Mississippi Department of Corrections, (Puckett) filed an answer to the original and amended complaints.

¶2. On June 30, 1995, a hearing was held before Hinds County Circuit Court Judge James E. Graves, Jr. Judge Graves ruled that Senate Bill 2175 is an *ex post facto* law as it applies to the Appellees, who were charged with committing crimes prior to July 1, 1995, but who were not to be sentenced until on or after July 1, 1995.

¶3. Puckett filed a notice of appeal. Both parties filed a joint motion for expedited treatment on appeal, which this Court granted on September 28, 1995.

## I.

### WHETHER SENATE BILL 2175 OF THE 1995 LEGISLATIVE SESSION (THE "TRUTH IN SENTENCING" LAW) VIOLATES THE STATE AND FEDERAL CONSTITUTIONAL PROHIBITIONS AGAINST Ex post facto LAWS AS APPLIED TO OFFENDERS CHARGED WITH COMMITTING CRIMES THAT OCCURRED PRIOR TO JULY 1, 1995.

¶4. The retroactive application of Senate Bill 2175 requires that eighty-five percent (85%) of a sentence be served and eliminates the opportunity for parole that existed prior to Senate Bill 2175. The Appellees, all charged with felony crimes that occurred prior to the effective date of Senate Bill 2175, argue that this effectively increases the length of incarceration that an inmate must serve after they have been sentenced and therefore violates the Ex Post Facto Clauses of the United States and Mississippi Constitutions.

¶5. Prior to July 1, 1995, most offenders convicted of felonies and sentenced to a term of incarceration of one (1) year or more, were allowed to be eligible for parole after serving twenty-five percent (25%) of their sentence pursuant to Miss. Code Ann. § 47-7-3 (Supp. 1993) (Parole Board Review). This section stated:

> (1) Every prisoner who has been or may hereafter be convicted of any offense against the State of Mississippi, and is confined in the execution of a judgment of such conviction of the Mississippi State Penitentiary for a definite term or terms of one (1) year or over, or for the term of his or her natural life, whose record of conduct shows that such prisoner has observed the rules of the Penitentiary, and who has served not less than one-fourth (¼) of the total of such term or terms for which such prisoner was sentenced, or, if sentenced to serve a term or terms of thirty (30) years or more, or, if sentenced for the term of the natural life of such prisoner, has served not less than ten (10) years of such life sentence, may be released on parole as hereinafter provided . . . .

Miss. Code Ann. § 47-7-3 (Supp. 1993). This section went on to enumerate the exceptions which

included: (a) prisoners convicted as habitual or confirmed criminals; (b) prisoners convicted of a sex crime who first had to receive an examination by a competent psychiatrist or psychologist before parole would be granted; (c) prisoners would not be eligible for parole until they had served one (1) year of their sentence, unless they had accrued any meritorious earned time allowance, in which case they were eligible for parole at earlier time increments; and (d) prisoners who after January 1, 1977, were convicted of robbery or attempted robbery through the display of a firearm would be eligible for parole until having served ten (10) years. Senate Bill 2175, Section 3, paragraph (1)(g) amended this section and a portion was added which reads "[n]o person shall be eligible for parole who is convicted or whose suspended sentence is revoked after June 30, 1995 . . . ." Act of Apr. 17, 1995, ch. 596, 1995 Miss. Laws 940 (codified at Miss. Code Ann. § 47-7-3 (1)(g) (Supp. 1995)).

¶6. Also prior to July 1, 1995, an inmate could obtain his release by serving fifty percent (50%) of his sentence pursuant to the earned time provisions of Miss. Code Ann. § 47-5-138 (1993) (Earned Release). This section before the amendment stated:

> (1) The department may promulgate rules and regulations to carry out an earned time allowance program based on the good conduct and performance of an inmate. An inmate is eligible to receive an earned time allowance of one-half (½) of the period of confinement imposed by the court except those inmates excluded by law. When an inmate is committed to the custody of the department, the department shall determine a conditional earned time release date by subtracting the earned time allowance from an inmate's term of sentence and shall prepare a conditional earned time release date for each inmate.

Miss. Code Ann. § 47-5-138 (1) (Supp. 1993). This section was amended to state that "[t]his section does not apply to any sentence imposed after June 30, 1995." Act of Apr. 17, 1995, ch. 596, 1995 Miss. Laws 941 (codified at Miss. Code Ann. § 47-5-138 (1) (Supp. 1995)).

¶7. Senate Bill 2175, Section 4, paragraph 4, amended Miss. Code Ann. § 47-5-138 (Supp. 1993) as follows:

> For any sentence imposed after June 30, 1995, an inmate may receive an earned time allowance of four and one-half (4-½) days for each thirty (30) days served if the department determines that the inmate has complied with the good conduct and performance requirements of the earned time allowance program. The earned time allowance under this subsection shall not exceed fifteen percent (15%) of an inmate's term of sentence.

Act of Apr. 17, 1995, ch. 596, 1995 Miss. Laws 941 (codified at Miss. Code Ann. § 47-5-138 (4) (Supp. 1995)).

¶8. Article I, § 9, Clause 3 of the United States Constitution states "No Bill of Attainder or ex post facto Law shall be passed." Article I, § 10, Clause 1 of the United States Constitution prohibits a state from passing *ex post facto* laws, stating "No State shall . . . pass any . . . ex post facto Law . . . ." The State of Mississippi adopted this prohibition in its Constitution in Article 3, § 16 stating, "Ex post facto laws . . . shall not be passed."

¶9. The United States Supreme Court has interpreted Article I, § 10 of the United States Constitution to forbid the enactment of

any statute which punishes as a crime an act previously committed, which was innocent when done; which makes more burdensome the punishment for a crime, after its commission, or which deprives one charged with crime of any defense available according to law at the time the act was committed . . . .

*Beazell v. Ohio*, 269 U.S. 167, 169 (1925).

¶10. "In accordance with this original understanding, we have held that the Clause is aimed at laws that 'retroactively alter the definition of crimes or increase the punishment for criminal acts.'" *California Dept. of Corrections v. Morales*, 115 S. Ct. 1597, 1601 (1995) (quoting *Collins v. Youngblood*, 497 U.S. 37, 41 (1990)). The United States Constitution "forbids the application of any new punitive measure to a crime already consummated . . . ." *Lindsey v. Washington*, 301 U.S. 397, 401 (1937).

¶11. The Supreme Court has held that the purpose of the Ex post facto Clause is to assure that legislative acts "give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed" and to "restrict[] . . . governmental power by restraining arbitrary and potentially vindictive legislation." *Weaver v. Graham*, 450 U.S. 24, 28-29 (1981) (footnote and citations omitted). A statute may violate the Ex post facto Clause "even if it alters punitive conditions outside the sentence . . . [or where it] substantially alters the consequences attached to a crime already completed, and therefore changes 'the quantum of punishment.'" *Id.* at 32-33 (citation omitted) (quoting *Dobbert v. Florida*, 432 U.S. 282, 293-94 (1977)).

¶12. In *Lindsey v. Washington*, 301 U.S. 397 (1937), the statute in question there, at the time the defendant committed his crime, sentenced grand larceny offenders to an indeterminate sentence of six months to fifteen years. *Lindsey*, 301 U.S. at 398. By the time the defendant was sentenced, a change in the law modified his penalty to a minimum fifteen-year sentence. *Id.* at 398-99. The Supreme Court invalidated the retroactive application of this new law, even though the new provisions did not increase the fifteen-year maximum sentence, but only made it mandatory, stating that "[t]he effect of the new statute is to make mandatory what was before only the maximum sentence." *Id.* at 400. "Removal of the possibility of a sentence of less than fifteen years . . . operates to [the defendant's] detriment in the sense that the standard of punishment adopted by the new statute is more onerous than that of the old." *Id.* at 400-01. The *Lindsey* Court found the retroactive application of the minimum fifteen-year sentence violated the Ex post facto Clause because the defendant was "deprived of all opportunity to receive a sentence which would give [the defendant] freedom from custody and control prior to the expiration of the 15-year term." *Id.* at 402.

> The Constitution forbids the application of any new punitive measure to a crime already consummated, to the detriment or material disadvantage of the wrongdoer. It is for this reason that an increase in the possible penalty is *ex post facto*, regardless of the length of the sentence actually imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier.

*Id.* at 401 (citations omitted).

¶13. In *Weaver v. Graham*, 450 U.S. 24 (1981), the United States Supreme Court again struck a retrospective statute changing the quantum of punishment to which a person was exposed for a given

offense. In *Weaver*, the defendant pled guilty to second-degree murder, which was committed on January 31, 1976. *Id.* at 25. He was convicted and sentenced to fifteen years in prison, less time already served. *Id.* at 25-26. The Florida statute at that time provided a formula for deducting gain-time credits from sentences for "every prisoner who has committed no infraction of the rules . . . and who has performed in a faithful, diligent, . . . and peaceful manner, the work, duties and tasks assigned to him." *Id.* at 26 (citations omitted) (quoting Fla. Stat. § 944.27(1) (1975)). In 1978, the Florida Legislature repealed the statute and enacted a new formula for monthly gain-time deductions which mandated that prisoners receive fewer days of good-time per month. *Id.*

¶14. Weaver sought habeas corpus relief claiming that the new statute, enacted subsequent to the crime being committed and which altered the method of gain-time computation, affected him detrimentally by extending his required prison time by more than two years and was therefore an ex post facto law. *Id.* at 27. The Florida Supreme Court denied Weaver's petition. *Id.* at 27-28. The United States Supreme Court reversed, holding that the 1979 Florida statute repealing the earlier 1975 statute and reducing the amount of gain-time violated the Ex post facto Clause when applied to a prisoner whose crime was committed before the statute's enactment. *Id.* at 36. "By definition, this reduction in gain-time accumulation lengthens the period that someone in petitioner's position must spend in prison." *Id.* at 33. The *Weaver* Court stated that "the *ex post facto* prohibition . . . forbids the imposition of punishment more severe than the punishment assigned by law when the act to be punished occurred." *Id.* at 30.

> Critical to relief under the Ex post facto Clause is not an individual's right to less punishment, but the lack of fair notice and governmental restraint when the legislature increases punishment beyond what was prescribed when the crime was consummated. Thus, even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense.

*Id.* at 30-31 (citations omitted).

¶15. In *Miller v. Florida*, 482 U.S. 423 (1987), the Supreme Court looked at the Florida sentencing scheme which had established "presumptive sentencing ranges" for various offenses, which sentencing judges were required to follow in the absence of "clear and convincing reasons" for a departure. *Miller*, 482 U.S. Id. at 426. When the petitioner in *Miller* committed his crime, his presumptive sentencing range would have been 3½ to 4½ years. *Id.* at 432. The state legislature altered the formula for establishing the presumptive sentencing range for certain sexual offenses, before Miller was sentenced, by increasing the "primary offense points" assigned to those crimes. *Id.* at 427. As a result, Miller's presumptive range progressed to 5½ to 7 years. *Id.* Thus, the *Miller* Court considered the operation of more severe sentencing guidelines to crimes that were committed before the guidelines' establishment. The United States Supreme Court held that this increase in the "quantum of punishment" violated the Ex post facto Clause. *Id.* at 434. The Court held that a prisoner need not show that he definitely would have served a lesser sentence under the previous legal scheme in order to show an *ex post facto* violation. *Id.* at 432. "In other words, the mere presence of *some* discretion . . . before . . . the change in law does not in and of itself foreclose an ex post facto claim." *Jones v. Georgia State Board of Pardons and Paroles*, 59 F.3d 1145, 1149 (11th Cir. 1995) (footnote omitted) (citing *Miller*, 482 U.S. at 432-33). The *Miller* Court, as in *Weaver*, emphasized that a crucial part of *ex post facto* jurisprudence was whether a defendant was given "fair

warning of [the] effect [of legislative enactment]" and could "rely on their meaning until explicitly changed." *Id.* at 430.

¶16. Senate Bill 2175, like the new law in *Lindsey*, increases the possible penalty, "regardless of the length of the sentence actually imposed, since the measure of punishment prescribed by the later statute is more severe than that of the earlier." *Id.* (citations omitted).

¶17. Senate Bill 2175, like the statute in *Weaver*, "constricts the inmate's opportunity to earn early release, and thereby makes more onerous the punishment for crimes committed before its enactment. This result runs afoul of the prohibition against *ex post facto* laws." *Id.* at 35-36 (footnote omitted).

¶18. Senate Bill 2175, like the new law in *Miller*, did not give these Appellees fair notice, and the punishment for the conduct being imposed has increased. *Id.* at 430. Thus, Senate Bill 2175 increases the "quantum of punishment," as expressly prohibited by *Weaver*.

¶19. In the three cases above, the United States Supreme Court held that the question for an *ex post facto* inquiry, after first determining that an amendment was indeed retrospective, was whether it "disadvantage[d] the offender affected by it." *Weaver*, 450 U.S. at 29; *Miller*, 482 U.S. at 430; *Lindsey*, 301 U.S. at 401. In a recent United States Supreme Court decision, *California Dept. of Corrections v. Morales*, 115 S. Ct. 1597 (1995), the Court concluded that this language was only dicta, holding that the proper focus for an *ex post facto* inquiry would be not "whether a legislative change produced some ambiguous sort of disadvantage . . . but on whether any change . . . increased the penalty by which such a crime is punishable." *Morales*, 115 S. Ct. at 1602 n.3 (citations omitted). In *Morales*, the Court stated that the inquiry is whether the retroactive statute "produces a *sufficient risk* of increasing the measure of punishment attached to the covered crimes." *Id.* at 1603 (footnote omitted) (emphasis added).

¶20. In the only Mississippi case to discuss *Morales*, Justice James Smith provided a thorough consideration of this decision in his dissenting opinion. *Hill v. State*, 659 So. 2d 547, 558-60 (Miss. 1995) (Smith, J. dissenting). Justice Smith noted that the *Morales* Court "maintained a long established precedent" and "reaffirmed its long held position that the question of what legislative adjustments are of sufficient moment to transgress the constitutional prohibition must be a matter of degree." *Id.* at 559. Under *Morales*, we now focus the inquiry on whether the legislative change increases the penalty by which a crime is punishable. As noted by Justice Smith, the "cases of *Lindsey*, *Miller* and *Weaver* that Morales argued to the Supreme Court in *Morales* were all enhanced punishment cases in clear violation of the Ex post facto Clause." *Hill*, 659 So. 2d at 560.

¶21. In *Morales*, the Court stated: "The *ex post facto* standard we apply today is constant: it looks to whether a given legislative change has the prohibited **effect** of altering the definition of crimes or increasing punishments." *Id.* at 1604 n.7 (emphasis added). Thus, the holding in *Morales* does not overrule *Weaver*, *Lindsey*, and *Miller* because the focus in those three cases were on the effect the new law had on the defendant. *Morales* does, however, sharpen the *ex post facto* inquiry by looking at whether the statute affected the prisoner's actual term of confinement, rather than whether the statute had disadvantaged the defendant. In looking towards the statute's effect, the *Morales* Court held that the statute in question was not ex post facto law because "there [wa]s no reason to conclude that the amendment w[ould] have any effect on any prisoner's actual term of confinement . . . ." *Id.* at 1604.

¶22. Under **Morales**, "what legislative adjustments 'will be held to be of sufficient moment to transgress the constitutional prohibition' *must* be a matter of 'degree.'" **Id.** at 1603 (quoting **Beazell v. Ohio**, 269 U.S. 167, 171 (1925)). The **Morales** decision means that when an amendment does not retrospectively "change the sentencing range" applicable to an offense, but does make a procedural or other change, that may indirectly affect the length of time that a prisoner may serve, no violation of the Ex post facto Clause has occurred because of the possibility of such an indirect effect is "speculative and conjectural." **Id.** at 1602, 1603. In other words the new law must have a direct effect on the sentence length. Thus, in keeping with the new focus promulgated by the United States Supreme Court, we will apply the **Morales** "effect" review.

¶23. In **Morales**, the respondent was sentenced to fifteen years to life for the murder of his wife in 1980, and was eligible for parole in 1990. **Id.** at 1598. In 1989, as required by California law, the Board of Prison Terms held a hearing in which the board found respondent unsuitable for parole. **Id.** Morales would have been eligible for another suitability hearing in 1990; however, this law was amended in 1981 to allow the Board to defer subsequent hearings for up to three years for a prisoner convicted of "more than one offense which involves the taking of a life" and if the Board found "that it was not reasonable to expect that parole would be granted at a hearing during the following years and states the bases for that finding." **Id.** at 1600 (footnote omitted) (quoting Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982)). Thus, pursuant to this amendment, the Board of Prison Terms scheduled Morales for a hearing in 1992. **Id.** Morales filed a federal habeas corpus petition, asserting that as applied to him, the 1981 amendment constituted an *ex post facto* law under the United States Constitution. **Id.** at 1598.

¶24. The Court stated it had previously declined to articulate a single formula for identifying legislative changes that have a sufficient effect on substantive crimes or punishments to fall within the constitutional prohibition. The Court articulated that the question of "what legislative adjustments 'will be held to be of sufficient moment to transgress the constitutional prohibition" *must* be a matter of 'degree.'" **Id.** at 1603 (quoting **Beazell**, 269 U.S. at 171.).

¶25. In evaluating how the legislative enactment affected Morales, the Court first looked at the amendment and how it only applied to a class of prisoners for whom the likelihood of release on parole was quite remote. **Id.** at 1603. The Court looked toward the fact that the amendment would "'relieve the [Board] from costly and time-consuming responsibility of scheduling parole hearings for prisoners who have no chance of being released.'" **Id.** at 1604 (quoting **In re Jackson**, 703 P.2d 100, 105 (Cal. 1985)).

¶26. Second, the Court determined that California carefully tailored the amendment to achieve some relief in a time-consuming responsibility. **Id.** "[T]he amendment has no effect on any prisoner unless the Board first concluded, after a hearing, not only that the prisoner is unsuitable for parole, but also that 'it is not reasonable to expect that parole would be granted at a hearing during the following years.'" **Id.** (quoting Cal. Penal Code Ann. § 3041.5(b)(2) (West 1982)).

¶27. Third, the amended statute had "no effect on the date of any prisoner's initial parole suitability hearing; it affects the timing only of *subsequent* hearings." **Id.** In addition the Court noted that "the Board retain[ed] the authority to tailor the frequency of subsequent suitability hearings to the particular circumstances of the individual prisoner." **Id.** Lastly, the Court found that the Board's

decision to defer parole review was subject to administrative appeal. *Id.* "An expedited hearing by the Board--either on its own volition or pursuant to an order entered on an administrative appeal--would remove any possibility of harm . . . ." *Id.* at 1605. In applying these considerations, the Court found no ex post facto violation, because the amendment "create[d] only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes." *Id.* at 1603.

¶28. Although the *Morales* Court stated that it would not set out a bright-line test, the above factors emphasized by the Court in applying this "effect" review, as applied to Senate Bill 2175, establish that the California amendments in consideration in *Morales* and Senate Bill 2175 are materially different in many ways.

¶29. The first consideration in the *Morales* review, is the amount of prisoners the amendment will affect. Senate Bill 2175 will influence a large class of prisoners. Every prisoner who was convicted of any offense before June 30, 1995, and was sentenced for a term of a year of over after July 1, 1995, with the exception of habitual offenders, sex offenders who did not receive an examination by a psychiatrist or psychologist, or any person who was convicted of robbery or attempted robbery through the display of a firearm after 1977, would have been eligible for parole under Miss. Code Ann. § 47-7-3 (Supp. 1993) after serving no less then one-fourth (¼) of the total of his term. Also, any inmate could obtain his release by serving fifty percent (50%) of his sentence pursuant to the earned time provisions of Miss. Code Ann. § 47-5-138 (Supp. 1993). Thus, unlike *Morales*, Senate Bill 2175 clearly lengthens the Appellees sentences. *Id.* at 1603.

¶30. Second, the statute in *Morales* had "no effect on the date of any prisoner's initial parole suitability hearing; it affect[ed] the timing only of subsequent hearings." *Id.* at 1604. However, unlike the California statute in question, Senate Bill 2175 goes much further. It clearly eliminates any possibility for parole stating in definite terms that "[n]o person shall be eligible for parole who is convicted or whose suspended sentence is revoked after June 30, 1995." This Court cannot conclude, as the *Morales* Court did, that the likelihood of parole for the Appellees was remote. *Id.* at 1603.

¶31. Third, the statute in *Morales* was "no arbitrary decision." *Id.* at 1604. In the case at hand, there was no case specific inquiry or hearing conducted before the Legislature gave these Appellees longer sentences. *Id.* at 1604. The increase in the Appellee's sentence, the ineligibility to receive parole before serving eight-five (85%) of his sentence, is to be exercised automatically across the board. Thus, this new disadvantage imposed by this legislation applies to everyone who has committed a felony violation and would be committed for over a year.

¶32. Puckett argues that the *Morales* decision requires this Court to reverse the lower court in that the amendment does not increase the penalty by which a crime is punishable. However, even applying the considerations promulgated in *Morales* leads to the ineluctable decision that the amendment as applied to these Appellees, will directly "increase the measure of punishment for covered crimes," and the effect on these Appellees is not merely "speculative and attenuated," thus Senate Bill 2175 is an *ex post facto* law.

¶33. Senate Bill 2175 eliminates any possibility for parole for all offenders who are sentenced on or after July 1, 1995, yet who committed their crimes before July 1, 1995, or whose suspended sentence are revoked after June 30, 1995. Prior to the enactment of the bill, prisoners had the possibility for

parole after serving twenty-five (25%) of their sentence pursuant to Miss. Code Ann. § 47-7-3 (1993) or an inmate could obtain his release by serving fifty percent (50%) of their sentence pursuant to the earned time provisions of Miss. Code Ann. § 47-5-138 (1993). By denying the opportunity for parole, prior to serving eighty-five percent (85%) of his sentence, Senate Bill 2175 effectually increases the "standard of punishment," *Lindsey v. Washington*, 301 U.S. 397, 401 (1937), or the "quantum of punishment," *Miller v. Florida*, 482 U.S. 423, 434 (1987), is "more onerous than the law in effect on the date of the offense," *Weaver v. Graham*, 450 U.S. 24, 30-31 (1981), makes "more burdensome the punishment for a crime," *Beazell v. Ohio*, 269 U.S. 167, 169 (1925), and is not a "most speculative and attenuated risk of increasing the measure of punishment attached to covered crimes." *California Dept. of Corrections v. Morales*, 115 S. Ct. 1597, 1605 (1995).

## CONCLUSION

¶34. Senate Bill 2175, as applied retroactively to the Appellees, has the effect of increasing the punishment beyond what was prescribed when the crimes were committed. Accordingly, Senate Bill 2175, as applied to these Appellees, is *ex post facto* law in direct contravention of the United States and Mississippi Constitutions.

¶35. AFFIRMED.

PRATHER, P.J., BANKS, McRAE, ROBERTS AND MILLS, JJ., CONCUR. SMITH, J., DISSENTS WITH SEPARATE WRITTEN OPINION. LEE, C.J., PITTMAN, J., NOT PARTICIPATING.


SMITH, JUSTICE, DISSENTING:


*¶36.* I dissented in *Hill v. State*, 659 So. 2d 547 (Miss. 1994), regarding whether Miss. Code Ann. § 99-19-105 (Supp. 1994) was an *ex post facto* law. In *Hill*, I proceeded with an analysis of the United States Supreme Court opinions of *Dobbert v. Florida*, 432 U.S. 282, 292 (1977); *Collins v. Youngblood*, 497 U.S. 37, 41 (1990); *Lindsey v. Washington*, 301 U.S. 397, 401 (1937); *Miller v. Florida*, 482 U.S. 423 (1987); *Weaver v. Graham*, 450 U.S. 24 (1981); and *California Dept. of Corrections v. Morales*, 115 S.Ct. 1597 (1995), to arrive at the conclusion that there was no *ex post facto* violation. I therefore readopt that portion of my dissent in *Hill*, 659 So. 2d at 557-561, which I find to be again on point and applicable to the case *sub judice.*

*¶37.* Senate Bill 2175 requires that eighty-five percent of a sentence be served and eliminates the opportunity for parole that existed previously. Prior to passage of the law, most offenders convicted of felonies and sentenced to terms of incarceration of one year or more were eligible for parole after serving twenty-five percent of their sentence. Miss. Code Ann. § 47-7-3 (Supp. 1993). The majority holds that "Senate Bill 2175, as applied retroactively to the Appellees, has the effect of increasing the punishment beyond what was prescribed when the crimes were committed. Accordingly, the majority holds that Senate Bill 2175, as applied to these Appellees, is an *ex post facto* law in direct contravention of the United States and Mississippi Constitutions." I disagree and therefore dissent.

¶38. Senate Bill 2175 is not a violation of either the state or federal constitutions and therefore not *ex post facto*. Criminal defendants who committed offenses prior to July 1, 1995, were merely allowed the opportunity to take advantage of provisions for early release by way of earned release or parole board review. Miss. Code Ann. § 47-5-138 and § 47-7-3. The definition of what constitutes criminal conduct is not changed by Senate Bill 2175. Nor is the penalty by which a crime is punishable.

¶39. When a defendant is sentenced to custody of the Mississippi Department of Corrections (MDOC), there is no guarantee that the inmate will be released on his earned time release date. The projected release date is simply that, projected. It is clearly conditional upon several factors, i.e., good conduct and performance requirements which must be met to even be eligible for earned time. The violation of MDOC rules definitely affects whether an inmate forfeits earned time. Miss. Code Ann. § 47-5-138 (2). Therefore, the earned time release date is nothing but a projected, possible, and "conditional" date which provides the opportunity for a inmate to take advantage of MDOC rules for a possible early release.

¶**40.** An examination of Miss. Code Ann. § 47-7-3, which governs when a convicted felon appears before a parole board for a hearing yields the same result. The statute makes it clear that if an inmate has met several requirements they "may be released on parole." Miss. Code Ann. § 47-7-3(1). Thus, parole board hearings are nothing more than possible or conditional means for an inmate who has behaved and obeyed MDOC rules to be considered for early release. Again, no guarantees and certainly no "retroactive altering of the definition of crimes or increase[d] . . . punishment for criminal acts," as in *Beazell v. Ohio*, 269 U.S. 167, 169-170 (1925).

¶41. In *California Dept. of Corrections v. Morales*, 115 S.C.. 1597 (1995), Morales was allowed to plead nolo contendere in 1980 to second-degree murder, despite a previous conviction for first-degree murder. He was sentenced to fifteen years to life. The law in effect in 1980 at the time of Morales' offense then entitled him to a mandatory parole hearing in 1989 and in each successive year thereafter. California amended its parole statute in 1981 to delay parole hearings for multiple murderers for up to three years. The Ninth Circuit Court of Appeals reversed the denial of Morales' petition for habeas corpus but, the United States Supreme Court, revisiting *Collins v. Youngblood*, 497 U.S. 37, 41 (1990), declined to find an *ex post facto* violation. The *Morales* Court, in holding that the amendment did not increase the punishment for the crime held that:

> It left untouched his indeterminate sentence and the substantive formula for securing any reductions to the sentencing range . . . . the amendment creates only the most **speculative and attenuated possibility of increasing the measure of punishment for covered crimes, and such conjectural effects are insufficient under any threshold that might be established under the Clause.**

*Morales* 115 S.Ct. at 1602-03. (emphasis added).

¶42. Here, the majority accepts the Appellees' argument that Mississippi Code Ann. §99-19-105 ( Supp. 1994), constitutes an *ex post facto* law because their punishment is enhanced due to the requirement that the innate must now serve eighty-five percent of their sentence before being released, whereas previously they would have been eligible for parole. They claim that this causes them to operate at a disadvantage. The majority fails to recognize the distinction between a legislative change which produces some ambiguous sort of disadvantage or affects a prisoner's opportunity to

take advantage of early release provisions and one which alters the definition of criminal conduct or increases the penalty by which a crime is punishable." *Id.*, at 1602 n.3. An analysis of **Morales** and the application of the **Youngblood** *ex post facto* inquiry by the United States Supreme Court clearly dictates that the latter, not the former, situation produces an unconstitutional result.

¶43. The Supreme Court considered and distinguished **Lindsey, Miller, and Weaver** from **Morales**. They may also be distinguished in the case at bar. There is no *ex post facto* violation. As I stated in the **Hill** dissent, "the precedent decisions of **Dobbert, Youngblood** and **Morales** applied to the case at bar, clearly indicate no vested right [of Abels, et al] was impaired that would constitute an **Ex Post Facto** violation." **Hill**, at 561.

¶44. I respectfully dissent.