Wood v. Pallito, No. 947-12-09 Wncv (Crawford, J., Nov. 3, 2010)

[The text of this Vermont trial court opinion is unofficial. It has been reformatted from the original. The accuracy of the text and the accompanying data included in the Vermont trial court opinion database is not guaranteed.]

STATE OF VERMONT

SUPERIOR COURT                                    CIVIL DIVISION
Washington Unit


Robert Wood v. Andrew Pallito                     Docket No. 947-12-09 Wncv

Mark Benjamin v. Andrew Pallito                   Docket No. 963-12-09 Wncv

Kyle Pivonka v. Andrew Pallito                    Docket No. 964-12-09 Wncv

Steven Kinney v. Andrew Pallito                   Docket No. 102-2-10 Wncv

Jason Blow v. Andrew Pallito                      Docket No. 121-2-10 Wncv


**Decision on**
**(1) Plaintiffs' Motions for Summary Judgment (Nos. 947-12-09 Wncv,**
**963-12-09 Wncv, 102-2-10 Wncv, and 121-2-10 Wncv) and**
**(2) Defendant's Motion to Dismiss (No. 964-12-09 Wncv)**[1]

In 2009, the legislature adopted 28 V.S.A. § 204b, which applies to "high-risk sex offenders" as follows:

A person who is sentenced to an incarcerative sentence for a violation of any of the offenses listed in subsection 204a(a) of this title and who is designated by the department of corrections as high-risk pursuant to 13 V.S.A. § 5411b while serving his or her sentence shall not be eligible for parole, furlough, or any other type of early release until the expiration of 70 percent of his or her maximum sentence.[2]

Plaintiffs are inmates in the custody of the Vermont Department of Corrections (DOC). They allege that they were serving qualifying sentences prior to the adoption and effective date of § 204b, that their minimum sentences were lower than 70% of their maximums, and that the DOC subsequently classified them as high-risk and imposed the new 70% rule. They claim that, as applied to them, 28 V.S.A. § 204b violates the Ex Post Facto Clause of the United States

---

[1] These cases were filed separately and have not been consolidated under V.R.C.P. 42. The pending motions are decided jointly because they share a common question of law. The parties are cautioned against submitting any joint filings unless these cases are formally consolidated under Rule 42.

[2] The 2009 pocket part to Title 28 includes a typographical error, incorrectly referring to a nonexistent section of Title 13 in the text of 28 V.S.A. § 204b. The error was corrected in the 2010 pocket part and was not present in the statutory language as adopted by the legislature. 2009, No. 1, § 44. The adoption of § 204b is one provision of Act No. 1, "An Act Relating to Improving Vermont's Sexual Abuse Response System."

Constitution, U.S. Const. art. I, § 10.[3] Defendant Andrew Pallito represents the DOC in his official capacity as the Commissioner of the DOC.

Each plaintiff filed a summary judgment motion with his complaint, addressing the Ex Post Facto question.[4] The DOC opposed summary judgment in all cases, and filed a motion to dismiss Mr. Pivonka's case as moot, which the court grants.[5]

**Background**

The facts are undisputed. Each plaintiff is serving an incarcerative sentence, with an original effective minimum lower than 70% of his maximum, for violations of offenses listed in 28 V.S.A. § 204a(a). Qualifying offenses include: lewd and lascivious conduct, 13 V.S.A. § 2601; lewd and lascivious conduct with a child, 13 V.S.A. § 2602; sexual assault, 13 V.S.A. § 3252; aggravated sexual assault, 13 V.S.A. § 3253; kidnapping with intent to commit sexual assault, 13 V.S.A. § 2405(a)(1)(D); and any offense involving the sexual exploitation of children in violation of 13 V.S.A. §§ 2821–2828.

Pursuant to 28 V.S.A. § 204b, the DOC classified each plaintiff as high-risk under 13 V.S.A. § 5411b. Section 5411b is part of Vermont's previously adopted sex-offender registration law. 13 V.S.A. §§ 5401–5422. A high-risk sex offender under 13 V.S.A. § 5411b is one who poses a "high degree of dangerousness . . . to others," including the "probability of a sexual reoffense." 13 V.S.A. §§ 5401(16), 5411b(a). Section 5411b(c) directs the DOC to adopt rules and identify such offenders. The rule appears in the Vermont Administrative Code as § 12-8-4:1–6 or DOC Rule 4, and is available on Westlaw at VT ADC 13 130 025.

Under DOC Rule 4.1–4.7, DOC staff may refer a sex offender believed to pose a high degree of dangerousness to others to the Sex Offender Review Committee. The initial referral must be based on "current objective risk assessment instruments" reflecting current best practices, as well as other factors defined nonexclusively as "appropriate." Within 4 weeks, the Committee determines whether the offender is high-risk and so notifies the offender, among others. The offender may challenge an unfavorable determination before the Committee at a hearing at which the offender has the right to be represented, to be heard, and to present evidence. If the Committee again finds against the offender, the offender may seek *de novo* review before the civil division of the superior court pursuant to 13 V.S.A. § 5411b(b).

---

[3] The prospective application of 28 V.S.A. § 204b is not at issue in this case.

[4] Each plaintiff replied to the DOC's opposition memorandum with a filing characterized as an opposition to the DOC's cross-motion for summary judgment. The DOC, however, did not file a cross-motion for summary judgment in any of these cases.

[5] Mr. Pivonka filed no opposition to the DOC's motion to dismiss. In short, the DOC asserts that, though it had classified him as high-risk under 28 V.S.A. § 204b initially, it subsequently reversed itself and has no present plans to revisit that decision. Section 204b currently does not apply to Mr. Pivonka and nothing in the record suggests that it likely will in the future in some manner that might evade review. His claim is moot. The DOC's motion to dismiss is granted.

Because Plaintiffs were determined to be high-risk sex offenders, the DOC applied the 70% rule of 28 V.S.A. § 204b to them. Section 204b effectively increases a high-risk offender's minimum sentence to 70% of the maximum sentence and makes the raised minimum a *hard* minimum, with no opportunity for any sort of earlier release (furlough, parole, or otherwise).[6]

Prior to the enactment of 28 V.S.A. § 204b, Mr. Wood had an original, effective 4-year minimum sentence.[7] Under § 204b, he has a nearly 19-year hard minimum (a 375% increase). Mr. Benjamin's minimum was raised from 8 years to 21 years (a 163% increase). Mr. Kinney's minimum was raised from 20 years to nearly 31 years (a 55% increase). Mr. Blow's minimum was raised from 3 years to about 5 ½ years (an 87% increase).[8]

Before 28 V.S.A. § 204b, Plaintiffs would have been eligible for parole at the completion of their original minimum sentences and every 1 or 2 years after that. 28 V.S.A. § 501(2); Vermont Parole Board Manual ch. 4, pt. II. They were eligible for conditional re-entry furlough upon serving their minimum sentences even if they had been classified at the "C" level. See DOC Directive 371.15 § 4.1. C is the DOC's most serious management program level, reserved for inmates convicted of "egregious" crimes and who exhibit a moderate to high risk to reoffend. DOC Directive 371, Policy, Appendix A. They could have been considered for reintegration furlough starting 180 days or more before their minimums. See generally DOC Directive 371.26 (reintegration furlough); Interim Revision Memo (June 24, 2010) (increasing the reintegration furlough window from 90 to 180 days). They would have been eligible for the various other types of furlough no later than upon completion of their minimum sentences. See generally 28 V.S.A. § 808.

**The Ex Post Facto Clause**

"No State shall . . . pass any . . . ex post facto Law." U.S. Const. art. I, § 10.[9] "Ex post facto" is Latin for "after the fact." *Collins v. Youngblood*, 497 U.S. 37, 41 (1990). The U.S. Supreme Court has described the purpose of the Ex Post Facto Clause succinctly as follows:

---

[6] The DOC suggests that 28 V.S.A. § 204b does not alter these Plaintiffs' minimums, that their minimums remain the same after applying § 204b as when they were sentenced. This is true in the most formalistic sense only, however. While § 204b does not technically change the nominal minimum, it makes the original minimum completely irrelevant and replaces it with a new effective minimum. See *Weaver v. Graham*, 450 U.S. 24, 31 (1981) ("[I]t is the effect, not the form, of the law that determines whether it is *ex post facto*."). It even goes beyond that by eliminating eligibility for any sort of release that otherwise could have preceded the minimum. This the DOC does not dispute.

[7] The numbers in this paragraph are approximated based on the allegations in the complaints and the summary judgment motions, none of which the DOC has disputed.

[8] Each plaintiff submitted a "supplemental memorandum" describing the alleged effect of the 70% rule on inmate Timothy Lawyer. According to these memoranda, Mr. Lawyer is serving a zero to life sentence for lewd and lascivious behavior. Under § 204b, the DOC raised his minimum release date from zero, December 2005, to August 2060, when he will be 103 years old. The example surely is striking, but Mr. Lawyer is not a party in any of these cases, he has not sought to join any of them, the court is not aware that he has filed his own case in this or any other Vermont state court, and the allegations regarding him do not appear in Plaintiffs' curt statements of undisputed fact. The court will not consider the allegations regarding Mr. Lawyer further.

[9] The parallel *ex post facto* prohibition applicable to the Congress appears separately at U.S. Const. art. I, § 9.

The *ex post facto* prohibition forbids the Congress and the States to enact any law "which imposes a punishment for an act which was not punishable at the time it was committed; or imposes additional punishment to that then prescribed." Through this prohibition, the Framers sought to assure that legislative Acts give fair warning of their effect and permit individuals to rely on their meaning until explicitly changed. The ban also restricts governmental power by restraining arbitrary and potentially vindictive legislation.

*Weaver v. Graham*, 450 U.S. 24, 28–29 (1981) (footnotes and citations omitted). "The *ex post facto* prohibition also upholds the separation of powers by confining the legislature to penal decisions with prospective effect and the judiciary and executive to applications of existing penal law." *Id*. at 29 n.10. The Court has "not attempted to precisely delimit the scope" of the clause, but has "given it substance by an accretion of case law." *Dobbert v. Florida*, 432 U.S. 282, 292 (1977).

To be prohibited by the Ex Post Facto Clause, the law must be retrospective and it must disadvantage the offender affected by it. *Miller v. Florida*, 482 U.S. 423, 430 (1987). There can be no doubt that 28 V.S.A. § 204b is retrospective as applied to Plaintiffs, and the DOC does not argue otherwise. The "question can be recast as asking whether [the provision at issue] applies to prisoners convicted for acts committed before the provision's effective date." *Weaver v. Graham*, 450 U.S. 24, 31 (1981). Section 204b, as applied, clearly does.

The Ex Post Facto Clause does not set in stone the law in effect when an offender commits a crime against all subsequent changes that can be perceived as disadvantageous. *Dobbert v. Florida*, 432 U.S. 282, 293 (1977). In *Dobbert*, Florida's death penalty law changed after Dobbert murdered his daughter but before he was sentenced. Under the law in effect at the time of the crime, the jury would have made the final determination about death. Under the new law, the jury rendered an advisory opinion about death that the trial judge could overrule. The trial court applied the new law, and the result was not favorable to Dobbert: the jury advised the judge to impose life; the judge instead imposed death. The Court found no *ex post facto* violation because the change to the law simply introduced a new methodology by which death could be imposed. *Id*. at 293–94. The change was, as the *Dobbert* Court characterized it, merely procedural; it did not change the "quantum" of punishment and bring it within the Ex Post Facto Clause. Dobbert was not, as a general matter, substantially more likely to be sentenced to death under the new statute even though that is what happened in his particular case. The Court thus generalized: "a procedural change is not *ex post facto*." *Id*. at 293. The prohibition only applies to "matters of substance." *Miller v. Florida*, 482 U.S. 423, 430 (1987), quoting *Dobbert*, 432 U.S. at 293.

The Court clarified in *Collins v. Youngblood*, 497 U.S. 37, 45 (1990), that by "procedural," it means "changes in the procedures by which a criminal case is adjudicated, as opposed to changes in the substantive law of crimes." However, "simply labeling a law 'procedural,' . . . does not thereby immunize it from scrutiny under the Ex Post Facto Clause. Subtle *ex post facto* violations are no more permissible than overt ones." *Id*. at 46 (citation omitted). The Court's difficulty with its own procedural–substantive distinction in this context

4

likely reflects the wisdom of its reluctance in earlier cases "to precisely delimit the scope" of the clause. *Dobbert v. Florida*, 432 U.S. 282, 292 (1977).

The Court returned to this boundary-drawing exercise in *California Dep't of Corrections v. Morales*, 514 U.S. 499 (1995). Morales was released from prison to a halfway house after serving a portion of a murder sentence. While on release, he married an elderly woman and promptly murdered and dismembered her. He was returned to prison convicted of the second murder. He became eligible for parole several years later. The law in effect at the time of the second murder entitled Morales to an annual parole suitability hearing once he became eligible. After the second murder, however, the legislature authorized the parole board to hold suitability hearings for appropriate inmates every 2 or 3 years, at its discretion, rather than annually.

Morales argued that the slower frequency of hearings increased his punishment in violation of the Ex Post Facto Clause, presumably because he could become demonstrably suitable for parole in a year in which he would have no hearing. The Court rejected this argument, explaining that the statutory "amendment had no effect on the standards for fixing a prisoner's initial date of 'eligibility' for parole or for determining his 'suitability' for parole and setting his release date." *Id*. at 507. It merely reduced the frequency of his suitability hearings. Delayed suitability hearings work no substantial disadvantage because the board delays them only after determining that the inmate is unlikely to be suitable in the interim, the delayed schedule can be reconsidered if circumstances change, and the inmate can petition for an exception to the delayed schedule. Moreover, suitability for parole is merely one step in a lengthy process for actually being released on parole. *Id*. at 510–13. That is, any perception of an increased punishment by delayed hearings was remote at best and likely not real at all.

In so ruling, the Court reiterated that whether a change in the law is *ex post facto* is a question of degree:

> [C]ontrary to the approach advocated by respondent, we have long held that the question of what legislative adjustments "will be held to be of sufficient moment to transgress the constitutional prohibition" must be a matter of "degree." In evaluating the constitutionality of the [change of law at issue], we must determine whether it produces a sufficient risk of increasing the measure of punishment attached to the covered crimes. We have previously declined to articulate a single "formula" for identifying those legislative changes that have a sufficient effect on substantive crimes or punishments to fall within the constitutional prohibition, and we have no occasion to do so here. *The amendment [at issue] creates only the most speculative and attenuated possibility of producing the prohibited effect of increasing the measure of punishment for covered crimes, and such conjectural effects are insufficient under any threshold we might establish under the Ex Post Facto Clause.*

*Id*. at 509 (citations and footnotes omitted) (emphasis added). Emphasizing that the Clause protects against tangible, rather than speculative, increases in the measure of punishment, the Court explained,

Respondent's approach would require that we invalidate any of a number of minor (and perhaps inevitable) mechanical changes that might produce some remote risk of impact on a prisoner's expected term of confinement. Under respondent's approach, the judiciary would be charged under the Ex Post Facto Clause with the micromanagement of an endless array of legislative adjustments to parole and sentencing procedures, including such innocuous adjustments as changes to the membership of the Board of Prison Terms, restrictions on the hours that prisoners may use the prison law library, reductions in the duration of the parole hearing, restrictions on the time allotted for a convicted defendant's right of allocution before a sentencing judge, and page limitations on a defendant's objections to presentence reports or on documents seeking a pardon from the governor. These and countless other changes might create some speculative, attenuated risk of affecting a prisoner's actual term of confinement by making it more difficult for him to make a persuasive case for early release, but that fact alone cannot end the matter for *ex post facto* purposes.

*Id*. at 508–09 (footnote omitted). These are not the sorts of changes to the law that render a statute *ex post facto*.

Plaintiffs' argument in this case is straightforward. The adoption of the 70% rule completely eliminates any chance of early release, including parole and all forms of furlough, for a much longer time that would have been the case under the statutes in effect at the time their crimes were committed. It thus increases the measure of punishment for their crimes, and violates the Ex Post Facto Clause.

The DOC relies heavily on *Morales*, arguing that "The enactment of § 204b merely affected Plaintiff[s'] opportunity to take advantage of provisions for parole and, at worst, produces some ambiguous sort of disadvantage." It, therefore, "is not of sufficient moment to transgress the Ex Post Facto Clause." The DOC relies on *Girouard v. Hofmann*, 2009 VT 66, 186 Vt. 153, for the principle that a statutory alteration to Plaintiffs' eligibility for furlough *per se* cannot violate the Ex Post Facto Clause.

The DOC relies too heavily on *Girouard*. Girouard was sentenced to life, with the chance of parole, and no minimum. He alleged that after a substantial period of incarceration, a statutory change eliminated the opportunity for reintegration furlough prior to the completion of the minimum. Because he had no minimum, he could not qualify for reintegration furlough. Because he could not qualify for reintegration furlough, he could not qualify for parole. Perceiving that he had lost all opportunity for parole, he claimed an *ex post facto* violation. The trial court dismissed, ruling that Mr. Girouard had failed to state a claim. The Supreme Court reversed for factual development, explaining that if Mr. Girouard's opportunity for parole was so eliminated, he may prevail on his *ex post facto* claim.[10] *Id*. at ¶ 11.

The DOC relies upon two sentences of *Girouard* that are tangential, if not entirely unnecessary, to the Rule 12(b)(6) issue decided: "We agree that a change in the law that merely alters or eliminates an inmate's eligibility for furlough does not rise to an Ex Post Facto Clause

---

[10] The thrust of this ruling from *Girouard* plainly supports Plaintiffs' argument in this case.

violation. Such a change relates to prison administration and regulation, and not an element of punishment, and is, therefore, beyond the purview of the Ex Post Facto Clause." *Id*. at ¶ 9. In support of this generalization, the Court cites to several cases which so hold, though almost exclusively in the context of traditional "temporary" furloughs, short periods of time in which the inmate is released in some fashion to the community, accompanied by prison officials or under their scrutinizing supervision. Only one case cited deals with a more contemporary sort of furlough that is the functional equivalent of parole: *Plyler v. Moore*, 129 F.3d 728, 735 (4th Cir. 1997). The *Plyler* Court found an *ex post facto* violation in the furlough context. *Plyler* is consistent with contemporary authority that rejects formalistic distinctions between furlough and parole in favor of a comparative analysis of the actual rights and obligations involved. See generally, e.g., *Young v. Harper*, 520 U.S. 143 (1997) (ruling that Oklahoma's conditional release program is sufficiently similar to traditional parole that it is subject to the due process protections applicable to parole as described in *Morrissey v. Brewer*, 408 U.S. 471 (1972)). Whether a retrospective change affecting furlough eligibility or availability is *ex post facto* ought to depend on the characteristics of the furlough at issue. In this case, this issue need not be further explored because the 70% rule applies directly to parole eligibility.

Plaintiffs' cases demonstrate a clear *ex post facto* violation. They have lost, with certainty, all opportunity for parole and any other type of early release for a period far longer than they would have under the law in effect at the time that they committed their crimes. Their minimum sentences effectively have been replaced by substantially higher minimums. The new "minimums" are higher in arbitrary amounts. While all are 70% of the respective maximums, the increases in minimums range from 55% to 375%. They all are based on findings that each plaintiff is "high-risk," but the increases are not proportionate to individual risk and appear to be entirely unrelated to the likelihood of success once released. Plaintiffs had an opportunity to appeal the determinations that they are high-risk, but have no established ability to have that determination revisited if circumstances later change. Section 204b is punitive; it is not calculated to minimize the administrative burdens in the cases of those few inmates who would never qualify for release earlier than the expiration of 70% of their maximums. Plaintiffs received one sentence from the trial judge and now suffer a tangibly more onerous one under 28 V.S.A. § 204b.

There can be no question that the trial judges who sentenced Plaintiffs anticipated furlough and parole eligibility when determining their minimums and maximums. See *Weaver v. Graham*, 450 U.S. 24, 32 (1981) ("eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed"); *Warden, Lewisburg Penitentiary v. Marrero*, 417 U.S. 653, 658 (1974) ("parole eligibility can be properly viewed as being determined—and deliberately so—by the" sentencing judge). Nor can there be serious debate that the delay of parole eligibility—and probably some forms of furlough eligibility—for a protracted time typically will be considered an *ex post facto* violation. *Marrero*, 417 U.S. at 663; see generally *Puckett v. Abels*, 684 So.2d 671 (Miss. 1996) (concluding that the retrospective application of a statute requiring inmates to serve 85% of their maximums and eliminating earlier, previously available opportunities for early release violates the Ex Post Facto Clause). The retrospective application of the 70% rule plainly renders the current law "more onerous than the law in effect on the date of the offense[s]," and thus an *ex post facto* violation. *Weaver v. Graham*, 450 U.S. 24, 30–31 (1981).

7

The DOC's reliance on *Morales* is misplaced. The DOC claims that the effect of the 70% rule on Plaintiffs is too speculative to be an *ex post facto* violation. This could be so only in the sense that furlough and parole are not guaranteed once an inmate reaches the minimum, and thus it will always be uncertain in a particular case whether an inmate subject to the 70% rule would have been released earlier if the rule had not been applied. This argument, however, conflicts with the U.S. Supreme Court's long-established interpretation of the Ex Post Facto Clause.

The elimination of eligibility for furlough, parole, and any other type of early release under the 70% rule is certain, not speculative. The statute considered in *Morales* had no effect on eligibility for early release, and it did not disadvantage inmates in Morales's position in any appreciable way. It merely lengthened the schedule of parole suitability hearings in a manner that was designed to avoid a longer, more onerous punishment than that which was available when the underlying crimes were committed. Mr. Morales's argument that the statute nevertheless could in some circumstances result in a bad outcome for the inmate was simply too speculative to point up an *ex post facto* violation. *Morales* did not fundamentally alter the long course of the U.S. Supreme Court's *ex post facto* cases.

Plaintiffs are not required to prove the particular effect of the 70% rule on them personally to show an *ex post facto* violation. As the Nevada Supreme Court explained,

> As the Court stated in *Weaver v. Graham*, 450 U.S. 24, 101 S.Ct. 960, 67 L.Ed.2d 17 (1981), "[t]he inquiry looks to the challenged provision, and not to any special circumstances that may mitigate its effect on the particular individual." 450 U.S. at 33, 101 S.Ct. at 966. This approach is also implicit in *Morales*, which focused not on whether the California amendment affected Morales' measure of punishment personally, but whether it affected the measure of punishment of anyone at whom the amendment was directed. Thus, although the possibility of [early release] may be speculative as to Miller . . . emphasis of this fact misses the proper focus of this inquiry—the more-than-speculative effect [that the statutory change eliminates an opportunity for early release].

*Miller v. Ignacio*, 921 P.2d 882, 885 (Nev. 1996) (per curiam). The retrospective application of 28 V.S.A. § 204b violates the Ex Post Facto Clause.

Though the legislature undoubtedly adopted 28 V.S.A. § 204b with public safety in mind, it bears no resemblance to the sort of civil commitment regime that the U.S. Supreme Court has readily found constitutional and outside the purview of the Ex Post Facto Clause, and the DOC does not argue otherwise. See generally *Kansas v. Hendricks*, 521 U.S. 346 (1997) (concluding that the procedure by which Kansas civilly commits sex-offenders following their incarcerative terms deviates little, if at all, from ordinary civil commitment statutes, and is constitutional for the same reasons).

8

**Order**

For the foregoing reasons, the DOC's motion to dismiss Mr. Pivonka's case, No. 964-12-09 Wncv, is granted. The remaining plaintiffs' summary judgment motions are granted.

Dated at Montpelier, Vermont this _____ day of November 2010.


_____
Geoffrey W. Crawford, Presiding Judge