DECISION AND JOURNAL ENTRY
Appellant Alisa Williams has appealed from a judgment of the Summit County Common Pleas Court, Juvenile Division, that granted permanent custody of her son to the Summit County Children Services Board (CSB). This court affirms the judgment of the juvenile court.
 I.
Alisa Williams is the mother of Gregory Williams, a seven-year-old.[1] On April 9, 1998, CSB filed a motion for temporary custody of the boy, based on allegations of dependency and neglect. The parties reached an agreement whereby the child would be found dependent as to his mother and the allegation of neglect would be dismissed. Temporary custody was granted to CSB.
Review hearings were held on October 28, 1998 and January 28, 1999. Prior to the sunset review hearing set for March 30, 1999, CSB filed a motion for a six-month extension of temporary custody. The magistrate denied the motion and ordered CSB to file for permanent custody. The motion for permanent custody was filed April 6, 1999.
A permanent custody trial was scheduled for June 28, 1999. On June 1, 1999, CSB filed a motion for continuance, on grounds that Ms. Williams' psychiatrist, whose testimony CBS termed essential to the case, would be out of the country on that date. The motion was granted on June 14, 1999. Trial was rescheduled for August 18-19, 1999.
On September 9, 1999, the juvenile court issued its decision, terminating Ms. Williams' parental rights and granting permanent custody to CSB. Ms. Williams has appealed, asserting five assignments of error. For ease of discussion, her first and second assignments of error will be addressed together.
 II. A. Assignment of Error No. 1 Because the permanent custody trial was not held within 120 days of the motion for permanent custody filed by SCCSB on April 6, 1999, [Ms. Williams'] right to due process was violated and the trial court's decision should be overturned and the matter remanded.
 Assignment of Error No. 2 Because [Ms. Williams] was not properly served with respect to the permanent custody trial of August 18 and 19, 1999, [her] right to due process was violated and the trial court's decision should be overturned and the matter remanded.
In her first and second assignments of error, Ms. Williams has argued that her due process rights were violated by failure 1) to set the permanent custody trial within 120 days of the date of filing the motion for permanent custody, and 2) to personally serve her with a new summons when the trial date was continued. The due process rights that Ms. Williams claims have asserted are the right to a timely trial and the right to notice.
This Court declines to consider these issues, however, since they were not preserved at trial. Constitutional matters not presented and argued at the trial court level are waived and a reviewing court is not required to address them on appeal. Gibsonv. Meadow Gold Dairy (2000), 88 Ohio St.3d 201, 204, citing toState v. Awan (1986), 22 Ohio St.3d 120, 122.
Even though the matters were waived, this Court feels compelled to point out that Ms. Williams not only attended the permanent custody trial proceedings, but also participated in them through examination by her attorney. It is difficult to see how any due process right was violated, where the extension was only fifteen days beyond the 120-day limit and the parties had agreed to the new trial date. Accordingly, Ms. Williams' first and second assignments of error are overruled.
 B. Assignment of Error No. 3 Because [Ms. Williams] was not adequately represented by counsel at trial, the trial court's decision should be overturned and the matter remanded.
In her third assignment of error, Ms. Williams has asserted that she was not afforded effective assistance of counsel, because her attorney failed to object to the introduction of hearsay at trial, both through the testimony of witnesses and through the admission of exhibits containing hearsay. This Court declines to address this assignment of error, because Ms. Williams' brief fails to identify in the record the error on which the assignment of error is based.
Pursuant to App.R. 12(A)(2), this Court "may disregard an assignment of error presented for review if the party raising it fails to identify in the record the error on which the assignment of error is based * * * ." Advertising Tapes, Inc. v. Misquitta
(Apr. 15, 1998), Summit App. No. 18631, unreported, at 2. An appellant's brief is required to contain argument and law "with citations to the authorities, statutes, and parts of the record on which the appellant relies." App.R. 16(A)(7). Although Ms. Williams' third assignment of error cites authority for the appropriate test to be applied to determine if counsel was effective, it is devoid of any specific references to the record where counsel should have objected.
As the appellant, Ms. Williams had the burden of affirmatively demonstrating error on appeal. Ivery v. Ivery (Jan. 12, 2000), Summit App. No. 19410, unreported, 2000 Ohio App. LEXIS 45, at *3. It is not the duty of this Court to search the record for evidence to support an appellant's argument of an alleged error. State v. Watson (1998), 126 Ohio App.3d 316, 321. Ms. Williams' unsubstantiated assertions cannot be considered on appeal as sufficient to carry her burden of showing that she was not adequately represented by counsel at trial. As such, her third assignment of error is overruled.
 C. Assignment of Error No. 4 Because the manifest weight of the evidence did not warrant a finding in favor of SSCSB's motion for permanent custody, the trial court's decision should be overturned.
In her fourth assignment of error, Ms. Williams has argued that the juvenile court's judgment was against the manifest weight of the evidence. When evaluating whether a judgment is against the manifest weight of the evidence in a juvenile court, the standard of review is the same as that in the criminal context. In re Ozmun (Apr. 14, 1999), Summit App. No. 18983, unreported, at 3. In determining whether a criminal conviction is against the manifest weight of the evidence:
 The court, reviewing the entire record, weighs the evidence and all reasonable inferences, considers the credibility of witnesses and determines whether in resolving conflicts in the evidence, the jury clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. The discretionary power to grant a new trial should be exercised only in the exceptional case in which the evidence weighs heavily against the conviction.
State v. Thompkins (1997), 78 Ohio St.3d 380, 387, quotingState v. Martin (1983), 20 Ohio App.3d 172, 175. See also,State v. Otten (1986), 33 Ohio App.3d 339, 340. Accordingly, before an appellate court will reverse a judgment as against the manifest weight of the evidence in this context, the court must determine whether the trier of fact, in resolving evidentiary conflicts and making credibility determinations, clearly lost its way and created a manifest miscarriage of justice.
Termination of parental rights is an alternative of last resort; however, it is sanctioned when necessary for the welfare of a child. In re Wise (1994), 96 Ohio App.3d 619, 624. Before a juvenile court can terminate parental rights and award permanent custody of a child that is neither abandoned nor orphaned to a proper moving agency, it must find by clear and convincing evidence that the grant of permanent custody to the agency is in the best interest of the child and that the child cannot be placed with either parent within a reasonable time or should not be placed with either parent. See R.C. 2151.414(B)(1); see also, Inre William S. (1996), 75 Ohio St.3d 95, 99. Clear and convincing evidence is that which will produce in the trier of fact "a firm belief or conviction as to the facts sought to be established."In re Adoption of Holcomb (1985), 18 Ohio St.3d 361, 368.
When determining whether a grant of permanent custody is in the best interest of the child, the juvenile court should:
 [C]onsider all relevant factors, including, but not limited to, the following:
 (1) The interaction and interrelationship of the child with the child's parents, siblings, relatives, foster parents and out-of-home providers, and any other person who may significantly affect the child;
 (2) The wishes of the child, as expressed directly by the child or through the child's guardian ad litem, with due regard for the maturity of the child;
 (3) The custodial history of the child, including whether the child has been in the temporary custody of a public children services agency or private child placing agency under one or more separate orders of disposition issued under section 2151.353 or 2151.415 of the Revised Code for twelve or more months of a consecutive twenty-two month period ending on or after the effective date of this amendment;
 (4) The child's need for a legally secure permanent placement and whether that type of placement can be achieved without a grant of permanent custody to the agency; [and]
 (5) Whether any of the factors in divisions (E)(7) to (12) of this section apply in relation to the parents and child.
R.C. 2151.414(D)(1) through (5).
When determining whether the child cannot be placed with either parent within a reasonable time or should not be placed with either parent, the juvenile court must find by clear and convincing evidence that at least one of the sixteen factors enumerated in R.C. 2151.414(E) exist as to each of the child's parents. See In re William S., 75 Ohio St.3d at 99. Those factors are:
 (1) Following the placement of the child outside the child's home and notwithstanding reasonable case planning and diligent efforts by the agency to assist the parents to remedy the problems that initially caused the child to be placed outside the home, the parent has failed continuously and repeatedly to substantially remedy the conditions causing the child to be placed outside the child's home. In determining whether the parents have substantially remedied those conditions, the court shall consider parental utilization of medical, psychiatric, psychological, and other social and rehabilitative services and material resources that were made available to the parents for the purpose of changing parental conduct to allow them to resume and maintain parental duties[;]
 (2) Chronic mental illness, chronic emotional illness, mental retardation, physical disability, or chemical dependency of the parent that is so severe that it makes the parent unable to provide an adequate permanent home for the child at the present time * * *[;]
 (3) The parent committed any abuse as described in section 2151.031 [2151.03.1] of the Revised Code against the child, caused the child to suffer any neglect as described in section 2151.03 of the Revised Code, or allowed the child to suffer any neglect as described in section 2151.03 of the Revised Code between the date that the original complaint alleging abuse or neglect was filed and the date of the filing of the motion for permanent custody;
 (4) The parent has demonstrated a lack of commitment toward the child by failing to regularly support, visit, or communicate with the child when able to do so, or by other actions showing an unwillingness to provide an adequate permanent home for the child;
 (5) The parent is incarcerated for an offense committed against the child or a sibling of the child;
 (6) The parent has been convicted of or pleaded guilty to an offense under division (A) or (C) of section 2919.22 or under section 2903.16, 2903.21, 2903.34, 2905.01, 2905.02, 2905.03, 2905.04, 2905.05, 2907.07, 2907.08, 2907.09, 2907.12, 2907.21, 2907.22, 2907.23, 2907.25, 2907.31, 2907.32, 2907.321, 2907.322, 2907.323, 2911.01, 2911.02, 2911.11, 2911.12, 2919.12, 2919.24, 2919.25, 2923.12, 2923.13, 2923.161, 2925.02, or 3716.11
of the Revised Code and the child or a sibling of the child was a victim of the offense or the parent has been convicted of or pleaded guilty to an offense under section 2903.04 of the Revised Code, a sibling of the child was the victim of the offense, and the parent who committed the offense poses an ongoing danger to the child or a sibling of the child.
 (7) The parent has been convicted of or pleaded guilty to one of the following:
 (a) An offense under section 2903.01, 2903.02, or 2903.03 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense was a sibling of the child or the victim was another child who lived in the parent's household at the time of the offense;
 (b) An offense under section 2903.11, 2903.12, or 2903.13 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 (c) An offense under division (B)(2) of section 2919.22
of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to the offense described in that section and the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense is the victim of the offense;
 (d) An offense under section 2907.02, 2907.03, 2907.04, 2907.05, or 2907.06 of the Revised Code or under an existing or former law of this state, any other state, or the United States that is substantially equivalent to an offense described in those sections and the victim of the offense is the child, a sibling of the child, or another child who lived in the parent's household at the time of the offense;
 (e) A conspiracy or attempt to commit, or complicity in committing, an offense described in division (E)(7)(a) or (d) of this section.
 (8) The parent has repeatedly withheld medical treatment or food from the child when the parent has the means to provide the treatment or food, and, in the case of withheld medical treatment, the parent withheld it for a purpose other than to treat the physical or mental illness or defect of the child by spiritual means through prayer alone in accordance with the tenets of a recognized religious body.
 (9) The parent has placed the child at substantial risk of harm two or more times due to alcohol or drug abuse and has rejected treatment two or more times or refused to participate in further treatment two or more times after a case plan issued pursuant to section 2151.412 of the Revised Code requiring treatment of the parent was journalized as part of a dispositional order issued with respect to the child or an order was issued by any other court requiring treatment of the parent.
(10) The parent has abandoned the child.
 (11) The parent has had parental rights involuntarily terminated pursuant to section 2151.353, 2151.414, or 2151.415 of the Revised Code with respect to a sibling of the child.
 (12) The parent is incarcerated at the time of the filing of the motion for permanent custody or the dispositional hearing of the child and will not be available to care for the child for at least eighteen months after the filing of the motion for permanent custody or the dispositional hearing.
 (13) The parent is repeatedly incarcerated, and the repeated incarceration prevents the parent from providing care for the child.
 (14) The parent for any reason is unwilling to provide food, clothing, shelter, and other basic necessities for the child or to prevent the child from suffering physical, emotional, or sexual abuse or physical, emotional, or mental neglect.
 (15) The parent has committed abuse as described in section 2151.031 of the Revised Code against the child or caused or allowed the child to suffer neglect as described in section 2151.03 of the Revised Code, and the court determines that the seriousness, nature, or likelihood of recurrence of the abuse or neglect makes the child's placement with the child's parent a threat to the child's safety.
(16) Any other factor the court considers relevant.
The juvenile court should consider all relevant evidence when making such a determination. R.C. 2151.414(E).
At the hearing in this matter, evidence was presented showing that CBS initiated efforts to obtain temporary custody of Gregory on April 9, 1998, after Akron police, responding to a call, found him alone with little or no food in the house. The case plan prepared by CSB stated four objectives for Ms. Williams: 1) to address concerns of substance abuse, by completing a substance abuse program and following recommendations to remain drug/alcohol free; 2) to meet her psychological, psychiatric, and behavioral needs, by having a psychological/psychiatric evaluation and following recommendations; 3) to obtain and maintain safe and secure housing; and 4) to maintain consistent visits with Gregory.
Jeanne Altland, a caseworker for CSB, testified that Ms. Williams entered four substance abuse programs between the time CSB obtained temporary custody of Gregory and the permanent custody trial. She was discharged from the Community Drug Board's intensive outpatient program after a month because she tested positive for cocaine. She also tested positive for cocaine while enrolled in the Exodus program. She was referred out of the Exodus program to an inpatient program at Interval Brotherhood Home (IBH).
Chrisopher Dunkel, a staff counselor at IBH, testified that Ms. Williams remained at IBH, with no positive drug tests, for approximately seventy days. She left, however, without completing the program. Mr. Dunkel stated that she had experienced difficulty adjusting to rules and staff admonishments at IBH.
Ms. Altland persuaded Ms. Williams to re-enter the Community Drug Board program after she left IBH, but she observed that Ms. Williams' only interest was in getting the program done. Her participation was minimal. Ms. Altland said Ms. Williams showed "no emotional commitment to sobriety for her own self but only wanted to get Greg back." Within six weeks of completing the program, she had tested positive again.
As for the second objective, Ms. Williams was evaluated at Portage Path Behavioral Health Center in August, 1998. After the evaluation, Ms. Williams elected not to follow through with the recommended clinical psychological evaluation at that time. Ms. Williams subsequently underwent two psychiatric evaluations at IBH, where she was diagnosed with major depressive disorder, recurrent and severe, with psychotic features, and alcohol and cocaine dependence. After leaving IBH, Ms. Williams returned to Portage Path, where she came under the care of Dr. Nirmala Apte, a psychiatrist. Dr. Apte concurred with the diagnosis of major depression with psychotic features. She testified that Ms. Williams' intake evaluation indicated she was hearing voices and believed people were plotting against her.
Dr. Apte prescribed medication, but she did not believe Ms. Williams was taking it. Although Ms. Williams would assure Dr. Apte that she was taking the medication, she admitted to her counselor that she was not. Once, she did not even fill the prescription. Moreover, Dr. Apte noted that there was not the improvement that could be expected, had she been taking the medication on a regular basis. Myra Schneider, a social worker at Harvest Home, a shelter where Ms. Williams stayed periodically, testified that Ms. Williams resisted taking her prescribed medication while she was staying there in March 1999.
Dr. Apte also diagnosed Ms. Williams with intermittent explosive personality disorder, which was explained as an exaggerated and/or unacceptable response to a situation. Several witnesses presented examples of this kind of conduct. Ms. Altland described Ms. Williams' response, when she was informed by the magistrate that CSB would be filing for permanent custody of Gregory. She stated that Ms. Williams "erupted out of her chair" and lunged at the magistrate, sweeping items off the bench. While her attorney attempted to restrain her, Ms. Williams further "raged and ranted" until security forces arrived. Michael Schmidt, an Akron police officer, testified that he responded to a call at a home where he was told Ms. Williams had broken out several windows in a violent outburst.
Despite the diagnoses of multiple mental problems and substance abuse, Robert Bingham, Ms. Williams' counselor at Portage Path, testified that Ms. Williams chose to limit her sessions to one a month. Mr. Bingham believed more sessions would have been helpful to her. He testified that her symptoms could be treated so that she could get some relief; however, Ms. Williams did not believe that what she was experiencing was part of a mental illness.
Ms. Altland testified that Ms. Williams' paranoia was worse in the last six weeks to two months before the trial. Ms. Williams would repeatedly leave messages on Ms. Altland's phone, insisting that Gregory was not safe in his foster home and that members of the foster family were "voodooizing" her. Ms. Williams also heard voices. She believed police had installed cameras to watch her, possibly through the Internet. She thought members of the foster family who were caring for Gregory followed her everywhere she went, stole things out of her purse, and generally harassed her.
Dr. Apte also testified that it had become more evident in recent sessions with Ms. Williams that her substance abuse was affecting her relationships and behavior. Ms. Williams' paranoia and her refusal to take prescribed medications, while at the same time continuing to take drugs, raised concerns for Dr. Apte that she was not capable of taking care of either herself or her son.
The evidence further showed that Ms. Williams was unable to achieve the case plan's stable housing objective. Ms. Williams had been in and out of shelters and IBH or living with relatives ever since CSB had taken temporary custody of Gregory. Ms. Altland stated that she gave Ms. Williams a list of low-income housing and offered the services of a case aide to take her to appointments, but she never found a place. Even at trial, Ms. Williams acknowledged that her present living arrangement with an uncle was only temporary.
Dorothy Lyman, Gregory's guardian ad litem, who observed a visitation where both Ms. Williams and her father were present, saw a "very strong bond in that family." Except for a period in August of 1998, where she missed three scheduled visitations in a row, Ms. Williams visited regularly with her son. During these visits, her conduct was not always appropriate, and she failed to show any improvement in her parenting skills.
Donna Ratte, a therapist with the Akron Child Guidance Center, testified that Gregory told her he could not sleep because he worried about his mother's safety and her drug use. She stated that those anxieties about his mother were a very big focus of the treatment he was receiving in the therapy session. Ms. Ratte further testified that Ms. Williams brought Gregory to Child Guidance originally in October 1997, because of various behavioral problems, including disrespectful behavior toward her, frequent temper tantrums, physical aggression toward other children, and noncompliance with rules and requests at home. He was diagnosed with attention deficit/hyperactivity disorder.
Gregory has been in three foster care homes since Ms. Ratte started working with him. His first was with a neighbor who knew him and described him as a kid who often "ran the streets" and was "raising himself." In his second placement, he displayed intense, frequent temper outbursts, with yelling, screaming, and pulling clothes out of drawers. His head-banging was so severe, it would wake others in the family and raised concern that he would harm himself. He used obscene language and made sexually suggestive statements to children in the neighborhood. After this family asked that he be moved, Gregory was placed with a third family. Ms. Ratte had observed a marked improvement in Gregory's ability to control his behavior since his placement with the third family. She said this family provides consistent limits and consequences for him.
Gregory was still very confused and angry over the separation from his mother. Ms. Ratte stated that, beginning in about February 1999, Gregory started to shut down in his sessions with her, because he said it hurt too much to talk about his mother. He blames himself for being removed from the home. Ms. Altland testified that Ms. Williams told Gregory during one of their visitations that he had to behave better, so he could go home with her.
An evaluation indicated that Gregory has strong anxiety about being safe and secure. He has a greater tendency than other children his age to perceive physical threats to his sense of safety. Ms. Ratte associates this with the conditions in which he was raised as a young child, because he had memories of his mother being beaten up by somebody. Bed-wetting has been a problem in each of his foster placements. The frequency of the condition seems to vary with the stress he is experiencing.
At the time of the trial, Ms. Ratte was assessing Gregory for major depressive disorder, and such assessment should be on-going. Ms. Ratte stated that Gregory needed a structured home environment. He needed consistent rules, limits, and consequences. He further needed parents who would advocate strongly for his needs at school and who would maintain close contact with his teachers and school staff. Ms. Ratte stated that these needs are currently being met by the foster family. Ms. Lyman, Gregory's guardian ad litem, testified that Gregory feels so secure with the foster family, that he had asked them if they would adopt him. Although the foster family had advised Ms. Lyman that they could not take on this responsibility, she recommended at trial that Gregory be permitted to remain in the present home for the time being.
Several witnesses expressed concern that the boy's needs would not be met, if he were returned to his mother's care and custody. Dr. Apte, Ms. Williams' psychiatrist, stated that her use of drugs and her paranoid state of mind would make her unable to attend to the child's needs. Ms. Altland testified that there was concern that if Gregory did not remain in a structured environment like the one set by the foster family, he would revert to his bad behavior.
As a result of the evidence presented at the hearing, the juvenile court concluded that it was in the best interest of the child to be placed in permanent custody of CSB. The juvenile court further determined that Gregory could not and should not be returned to Ms. Williams within a reasonable time. After reviewing the evidence, this Court concludes that the juvenile court's judgment was not against the manifest weight of the evidence. Ms. Williams' fourth assignment of error is overruled.
 D. Assignment of Error No. 5 Because the trial court's conclusions of the evidence paragraphs 2 and 12 are references to factors contained in newly enacted legislation, a determination of permanent custody based on these new factors are in violation of [Ms. Williams'] constitutional rights as an ex post facto application of the law.
In her fifth assignment of error, Ms. Williams claims her constitutional rights were violated by an ex post facto
application of the amended version of R.C. 2151.414, enacted effective March 18, 1999. However, the ex post facto Clause, Section 10, Article I of the United States Constitution, applies only to criminal statutes. State v. Cook (1998),83 Ohio St.3d 404, 415, citing California Dept. of Correctionsv. Morales (1995), 514 U.S. 499, 504. R.C. 2151.414 is not a criminal statute. In re Rodgers (June 5, 2000), Preble App. No. CA99-08-017, unreported, 2000 Ohio App. LEXIS 2385, at *17. See, also, In re Moody (August 7, 2000), Athens App. No. 99CA62, unreported, 2000 Ohio App. LEXIS 3645, at *18. There is a constitutional prohibition against certain retroactive laws expressed in Section 28, Article II, of the Ohio Constitution. However, it is unnecessary to consider that question here, since the juvenile court's judgment can be affirmed, despite its references to the two factors Ms. Williams finds objectionable.
The Ohio Supreme Court has held that a juvenile court need find only one of these factors before it can terminate parental rights and grant permanent custody to a public children services agency. In re William S., 75 Ohio St.3d at syllabus. The juvenile court here expressly found three factors listed in the prior version of R.C. 2151.414(E), besides the new ones to which Ms. Williams objects. Thus, the statutory requirements for terminating Ms. Williams parental rights and granting permanent custody to CSB were met, whether under the new version or the old. Ms. Williams' fifth assignment of error is overruled.
 III.
Ms. Williams' assignments of error are overruled. The judgment of the juvenile court is affirmed.
The Court finds that there were reasonable grounds for this appeal.
We order that a special mandate issue out of this Court, directing the County of Summit, Court of Common Pleas, to carry this judgment into execution. A certified copy of this journal entry shall constitute the mandate, pursuant to App.R. 27.
Immediately upon the filing hereof, this document shall constitute the journal entry of judgment, and it shall be file stamped by the Clerk of the Court of Appeals at which time the period for review shall begin to run. App.R. 22(E).
Costs taxed to Appellant.
Exceptions.
 ___________________________ BETH WHITMORE
FOR THE COURT, BATCHELDER, P. J., SLABY, J., CONCUR.
[1] This case also terminated the parental rights of alleged fathers Michael Beatice, Charles Collison, and John Doe. None of the alleged fathers, who were served by publication, appeared in this matter or made any effort to comply with case plan objectives set by CSB. Nor have any of them filed an appeal. Consequently, it is only the mother's appeal from the juvenile court's award of permanent custody to CSB that is being considered here.